191 So. 383

WOLCOTT v. TITUS et al.

1 Div. 61.

Supreme Court of Alabama.

Oct. 5, 1939.

H. M. Aldridge, of Mobile, for appellant.

344

Beebe, Hall & Beebe, of Bay Minette, for appellees.

BROWN, Justice.

This is a bill by a judgment creditor against the judgment debtor and his alleged vendee to cancel, set aside and annul a deed of conveyance of all the debtor's property to said vendee, Claude G. Godard, alleged to have been made to hinder, delay and defraud the complainant in the collection of his claims, and in the alternative to have said conveyance declared a general assignment for the benefit of creditors.

The Circuit Court, on final hearing, on pleadings and proof, denied relief and dismissed the bill, resting the decree on the grounds that the notes executed by the judgment debtor, Titus, to complainant were without consideration, and that the complainant did not come with clean hands. Unless the decree can be upheld on one or the other of these grounds the complain-

ant was entitled to relief, and the court erred in dismissing the bill.

At the very threshold of this controversy we are confronted with the fact that the defendants pleaded no such defense in their answer. The court, however, proceeded on the theory that while it was not necessary for the complainant to go behind the judgments into which the indebtedness had been merged, he nevertheless had voluntarily done so and this had opened the inquiry disclosing want of consideration for the execution of said notes.

■ We are of opinion that the court in both of these stated aspects was in error. The bill proceeds on the theory that the conveyance was constructively fraudulent, that it was a voluntary conveyance executed without sufficient consideration. The conveyance, attacked by the bill, antedated the judgments, and the burden of proof was on the complainant, as to the vendee, to show that an indebtedness due from Titus to complainant antedated said conveyance. The judgments standing alone were evidence of said indebtedness only from the date of their rendition. Yeend, Adm'r v. Weeks et al., 104 Ala. 331, 16 So. 165, 53 Am.St.Rep. 50; Burnwell Coal Co. et al. v. Setzer, 203 Ala. 395, 83 So. 139.

The evidence is without dispute that the consideration of the note first executed by Titus was money loaned Titus by complainant to pay the balance of the purchase money for a home in the Single Tax Colony of Fairhope, purchased by Titus from one Nelson Rockwell, of which Titus was then in possession.

Under the Act of the Legislature and the charter of said Single Tax Colony the legal title to all property in said Colony was vested in and held by the corporation, in trust for the benefit of the members, constituting the inhabitants of the Colony admitted by a vote of its members. The right of individual members to hold, occupy and use such real estate and improve the same, such improvements being held and owned by the members, is evidenced by a lease granted by the Colony conditioned to pay rents, the lease providing that in case of default for six months and notice the Colony may sell the improvements for the payment of the rent. All taxes levied by State and County are paid by the Colony.

The character of title and ownership is illustrated by the decision in the case of Fairhope Single Tax Corporation v. Melville, 193 Ala. 289, 69 So. 466.

■ The rights, in the instant case, to which Titus succeeded were mortgaged to complainant as security for said loan, or any other indebtedness which Titus might contract, and the lease was either endorsed to complainant or placed with the Bank of Fairhope in escrow, creating in legal effect an equitable mortgage on the leasehold interest and improvements, with an equity of redemption in Titus to remove the incumbrance and hold the property. Pollak et al. v. Millsap et al., 219 Ala. 273, 122 So. 16, 65 A.L.R. 110; Fields v. Karter, 121 Ala. 329, 25 So. 800.

The equity has not been cut off by foreclosure and still exists so far as appears here. True, as it appears, Titus defaulted in the payment of rent and the corporation sold his leasehold interest and improvements and complainant bought in the property at the sale to protect his security.

The other note was also given for money loaned by complainant to Titus and Ward B. Martin, and Titus testified that he, Titus, received and used the entire loan and that Martin received no part of it.

■ To reiterate, in the first instance, Titus got what he purchased, borrowed money from complainant to pay part of the purchase money pledging his holdings as a security for that loan and any subsequent indebtedness contracted. He contracted the subsequent debt, received the loan and used it. This evidence does not support the Circuit Court's holding that said notes were without consideration.

■ The lease under which Titus held was not in evidence, still if it be conceded that the Circuit Court's conclusion, that it was issued direct to complainant as a security for the loan and not to Titus, is correct, this did not add to or enhance complainant's security or deprive the defendant Titus of any right. Titus had already expressly conveyed his chattel interest to complainant in the note in these words:

"To secure the payment of this bond, or note, and any other debt we, or either of us now or may hereafter owe to said payee at or before the payment of this bond or note in full, or any other amount advanced hereunder, or secured hereby, I, or we, hereby grant, bargain, sell and con-

**346**

vey to said payee, the following property, to-wit:

"Lot 8, block 9, Div. 1 of the land of the Fairhope Single Tax Corp. of Fairhope, Ala., in the town of Fairhope, Baldwin Co., Alabama. The interest on this note to be paid at the rate of $9.33 monthly, beginning with June 6th, 1928.

"It is agreeable with the holder of this note, that same may be renewed on maturity, by making a substantial payment and renewal of balance. Propperly [properly] transferred lease to be held is [in] escrow with the Bank of Fairhope."

■ There is nothing in the evidence or in the dealings by the complainant with Titus to indicate that complainant has not dealt openly and at arm's length with Titus in the matter, or that justifies the conclusion that complainant comes into court with unclean hands.

■ Certain it is that complainant's patient indulgence through the years from 1928 to 1934—years of depression—without taking steps to enforce collection, and until the defendant Titus proceeded to dispose of all his property and take bankruptcy, can not justly be made the basis of declaring that complainant comes into court with unclean hands.

■ As before stated, the complainant is entitled to relief. If Titus was insolvent, and of this there is no dispute, and the conveyance was an actual transfer by the debtor of all or substantially all his property, the conveyance, under the influence of the statute, is a general assignment for the benefit of all his creditors. Code 1923, § 8040; Aycock v. Ft. Branch Mill. Co., 182 Ala. 326, 62 So. 94; Green & Gay et al. v. Wright, Williams & Wadley, et al., 160 Ala. 476, 49 So. 320.

■ If it was not an actual sale and transfer of the debtor's property and title, but a mere simulated, colorable transfer intended as a mere cover behind which the debtor may hide to enjoy the use of the property and prevent creditors from subjecting it to the payment of debts, it is fraudulent and void and should be vacated and annulled. Robinett et ux. v. Murray, 219 Ala. 176, 121 So. 535, 537.

■ After due consideration of the evidence we are of opinion that the conveyance attacked by the bill falls within the latter class, and is fraudulent and void.

We state, briefly, the reasons upon which this conclusion is rested.

The defendants in their several answers to the bill made a general denial of the existence of the debt due from Titus to complainant Wolcott, but the evidence shows without dispute the existence of complainant's claim that it is just, due and unpaid, and that it antedated the conveyance from Titus to Godard. In fact Titus admitted the existence and bona fides of said indebtedness.

■ This shown, the defendants, under the averments of their answer, had the burden of going forward with the evidence "to show a real sale and transfer of the title and use of the property in payment of a bona fide existing debt in an amount not greatly disproportionate to the value of the property." Robinett et ux. v. Murray, supra.

The property in question consisted of forty acres of land, some of it improved and in cultivation, used for dairying purposes, a herd of dairy cattle and farm tools, stock and equipment, inherited by Titus from his father on his death in March, 1934. The evidence is without dispute that the deed was withheld from record for several months, and until the complainant had sued on one of the notes and caused an attachment to be issued and levied on the property; that Titus remained in possession of the property, advertised it for rent or sale in his own name, and in a letter written about four months subsequent to the date of the conveyance, to a prospective renter, stated: "The land that I own is 40 acres, about 10 acres in cultivation." Fifteen days later he leased the property to said prospective renter, Bonnell, and the lease recites:

"This Insturment, Witnesseth, that J. H. Titus, Agent, hereinafter referred to as party of the first, does hereby lease the SW¼ of NW¼ of Section 21, T. 6. S. R. 2. E. containing 40 acres more or less, and known as the Sunny Side Dairy Farm, to P. L. & C. E. Bonnell, hereinafter referred to as party of the second part."

At this time he made no mention of having sold and conveyed the property, but told Bonnell that the reason for making the contract in the name of "J. H. Titus, Agent," was, while he was sole heir, that the estate of his father was in process of administration in the Probate Court. Titus testified, inter alia:

"A. Those notes I owed Dr. Godard—didn't seem like I was getting anywhere, so it was my suggestion that he take it over, and at that time I told about owing $500.00 to Alexander. Our understanding was that he would take it over and I would run the place as I had been doing until I could get a tenant or buyer. My understanding was that this money was to go to pay the note and I was to take care of it until the note to Alexander was paid.

"Q. If you could get a tenant or purchaser for the place you would sell? A. Yes, sir. And he would get his money out of it, and he could sell it for more than he put into it, and he would get the surplus.

"Q. Dr. Godard would get the surplus? Was that discussed between you? A. As to the sale? No, sir. The thought of selling, I believe, was secondary. I thought at the time it couldn't be sold and no price was put.

"Q. After you transferred the place to Dr. Godard there was no evidence of any physical change of possession, was there, on the premises? A. I don't know whether there was or not.

"Q. You continued to run the place just as always? A. Our agreement was that I was to take care of it until the Alexander note was paid off.

"Q. And you continued to run it as you always had—run it as a dairy? A. Yes, sir.

"Q. Did you pay him any of the profits? A. Who—Dr. Godard? He got it all—yes.

"Q. How did you pay that money to him—in cash or by check? A. What do you mean—the rent?

"Q. No, I mean the dairy profits. You were selling the dairy products, were you not? A. There wasn't any profits. It was losing money.

"Q. Who bore the loss? A. We just rocked along until we could get a tenant.

"Q. Who handled the profits? A. I did.

"Q. Dr. Godard never handled any of them—between August and January? A. No, sir."

The alleged consideration for the conveyance was the satisfaction of an alleged indebtedness of one thousand dollars, accumulating from year to year in blocks of $200 commencing in the year, 1928, money advanced by Godard to Titus, in the spring of each year, a $50 doctor's bill and $250 in cash, While Titus in his testimony does not positively so state, his testimony tends to show that the money was advanced to be used on the farm in the country and Godard states positively, "It was money I loaned to Jack that he said he would put in the crop out on the farm." This money was advanced, according to the testimony of both Godard and Titus, year after year without payments thereon, without security on the simple note of Titus and these notes, though delivered to Titus on the execution of the deed, were not produced in evidence, but as Titus expressed it, "lost I suppose."

The evidence shows that at the time of the alleged sale and conveyance Godard was in financial distress and was not able to keep up the instalment payments on his automobile; that although he had a bank account it was not sufficient to stand the withdrawal of $250 and no such sum was either drawn from the bank by Godard, or deposited by Titus, who also had an account with the bank.

There are glaring infirmities in the testimony of both Titus and Godard. The first we note is that Titus, so far as the evidence shows, was not interested in the farming operation until the death of his father in March, 1934; he was a city marshal on small salary and lived in the Colony.

Godard's testimony was given to a great extent in response to leading questions to which he answered "yes" and "no." He assumed to purchase without examination of title and without knowing or examining the dairy herd, at the time the dairy was being operated at a loss, and was left in possession of the alleged vendor to operate until the Alexander debt was paid, and so far as it was paid was to be paid in the name of Titus.

The arrangement resulting in the execution of the deed was on the initiation of Titus and was, according to phases of the evidence, accepted by Godard to aid Titus from the pressing importunities of his creditors.

The suggestion in brief of appellee that Titus has a homestead interest in said lands is without merit. To justify such claim the property must be impressed by use with the character of a homestead, and the evidence shows that no such use

was made of it by the defendant Titus. He with his family had resided continuously in the Colony and his wife lived on the property bought from Rockwell. See Kennedy v. First National Bank of Tuscaloosa, 107 Ala. 170, 18 So. 396, 36 L.R.A. 308.

Our conclusion, therefore, is that the defendants' failed to meet and carry the burden resting on them; that the decree of the Circuit Court should be reversed, and one here rendered cancelling, setting aside and holding for naught the deed of conveyance executed by the defendant J. H. Titus to Claude G. Godard, dated August 15, 1934, and filed for record in the office of the Judge of Probate of Baldwin County, on the 19th day of October, A. D. 1934, and recorded in Deed Book No. 56 N. S., at page 173, and the Register of the Circuit Court is directed to enter on the face of said record the fact of its cancellation by decree of this Court.

The case is remanded to the Circuit Court for further appropriate proceedings not inconsistent with this opinion.

Reversed, rendered and remanded.

ANDERSON, C. J., and THOMAS and BOULDIN, JJ., concur.