**Thorton REYBURN, Respondent,**

v.

**John Thornton SPIRES, Executor of the Estate of Virginia Jane Sharp, Deceased; Beulah Sharp Law and Lester Law, her husband, Appellants.**

No. 49284.

Supreme Court of Missouri,

Division No. 2.

Jan. 14, 1963.

Motion for Rehearing or to Transfer
to Court En Banc Denied
Feb. 11, 1963.

Max Oliver, Montgomery City, Latney Barnes, Barnes & Barnes, Mexico, for appellants Laws.

N. Murry Edwards, St. Louis, Ninian M. Edwards, Clayton, for plaintiff-respondent.

STOCKARD, Commissioner.

Defendants have appealed from a judgment setting aside a deed to certain real estate on the basis that it was in fraud of plaintiff as a creditor.

Miss Virginia Sharp and her niece, Beulah Sharp Law, each was the owner, the title having been acquired by inheritance, of an undivided one-half interest in 121.5 acres of land in Montgomery County.

Mrs. Law was a resident of Virginia and had never been in possession of the land. Miss Sharp, who had never married and was 89 years of age on March 20, 1957, lived on the land in a log cabin. What income she received from the land she retained and did not share it with Mrs. Law, but there is no indication that Mrs. Law asked for or expected to receive any part of it. Pursuant to a letter received from Thornton Reyburn, respondent herein and a second cousin of Miss Sharp who lived in St. Louis, Mrs. Law and her husband came to Missouri in February 1957 and arranged for Miss Sharp to be placed in the Spires Nursing Home at Bellflower, Missouri. At that time Miss Sharp was in a "weak condition and needed care." Mr. Law paid the charges for her care and maintenance at the nursing home to the end of March 1957, and in the presence of Thornton Reyburn agreed to be responsible for and guaranteed all subsequent expenses. Apparently such money that Miss Sharp had was to be used first for her care and maintenance, and Mr. and Mrs. Law agreed to pay all additional amounts needed. After these arrangements were completed Mr. and Mrs. Law returned to Virginia.

While she was in Missouri Mrs. Law apparently suggested to Miss Sharp that she should apply for old age assistance. At that time a person otherwise eligible for aid "could own up to $5,000 in property" but no more than $500 of that amount could be in cash and securities. Ruth Franey, the Montgomery County Director of the Division of Welfare, talked to Miss Sharp at the nursing home and determined that she was ineligible for assistance because Miss Sharp told her that in addition to her interest in the land she had $300 in a bank at Jonesburg, $500 in another bank or in a savings and loan association in St. Louis, and $367.69 "from her wheat crop * * * [which] was put in another bank [the name of which she could not remember] in St. Louis by her cousin, Thornton Reyburn." Miss Sharp stated that "when she used it [the money] down under $500 she

would re-apply." Miss Franey testified that during the conversation Miss Sharp mentioned that "at one time she thought of transfering part of it [the land] to Thornton Reyburn," and that she went with Reyburn to Montgomery City to talk to a lawyer, whose name she could not remember, but "she didn't like the way it was planned so she would not sign it." The reason why she had given consideration to transferring part of the land to Reyburn is not revealed.

On March 26, 1957 Miss Sharp asked Mr. Spires to take her to an attorney in Montgomery City where at her request a deed was prepared and executed by her conveying her interest in the 121.5 acres of land to Mrs. Law with a reservation in the grantor of a life estate. Both Mr. and Mrs. Spires stated that Miss Sharp had previously talked to them and said that she "wanted to transfer the land to her niece and that Reyburn had been taken care of otherwise." While at the attorney's office Miss Sharp also executed a will leaving all her property to Mrs. Law.

Sometime after Mr. and Mrs. Law returned to Virginia and before April 13, 1957, Reyburn went to the Spires Nursing Home and told Miss Sharp that he was going to take her away. This caused her to be "low spirited," and she told the Spires that she wished she could stay, but that "she had to do what he said" or he "mistreated her." While there is an indication that this visit by Reyburn was "two or three days" before April 13, Mrs. Spires testified that Miss Sharp "made the deed [to Mrs. Law] after she knew she would have to leave because she said if she ever got with him [Reyburn] she couldn't make it [the deed] like she wanted it." On April 13, without the knowledge or consent of Mrs. Law, Reyburn returned to the nursing home, paid the balance then due for the maintenance and care of Miss Sharp, but whether from his personal money or that of Miss Sharp is not shown, and took her away from the nursing home. The reason for this action by Reyburn is

not disclosed. He had participated in the arrangements in placing Miss Sharp in the home, Miss Sharp had money to pay for her care and maintenance for a substantial period of time, and Mr. Law had guaranteed all additional money needed. There is not the slightest indication that Reyburn was dissatisfied with the services of the Spires Nursing Home or that he justifiably could have been. Mr. Spires was under the impression that Miss Sharp was returning to her home on the farm, but apparently she was taken by Reyburn to St. Louis. The record does not disclose when Mrs. Law learned that Miss Sharp had been taken away from the nursing home, or what protest if any was made by her. She returned to Missouri to be with her aunt on her 90th birthday on March 20, 1958, and she would have learned of the change at that time if not earlier.

On May 7, 1958, while Miss Sharp was in Reyburn's home in St. Louis, or at least at the time that Reyburn alleged that his home was her residence, and when she was "ninety years of age and [was] and [had] been for several years feeble," Reyburn filed suit against her in the Circuit Court of the City of St. Louis. He alleged that he had "taken care" of Miss Sharp from February 10, 1941 to the "present time" by furnishing her at her request with "food, board, meals, nursing care, and the essentials of life running errands for her from time to time, and furnishing her with transportation from time to time with the use of his automobile in conveying her to places where she wished to go; that two-thirds of the time he furnished the defendant with board, room and meals at his home, during the winter months, * * * and about one-third of the time he lived with the defendant during the summer months, on her farm," except when she was in "an old folks home" between February 27 and April 13, 1957. He then alleged that the reasonable value of the above services was $360 per year for a period of 17 years, or a total of $6,120. He also sought by his petition to recover $1,727.96 for work,

labor, and materials supplied by him on the 121.5-acre farm of Miss Sharp from 1941 to the "present time" which consisted, he alleged, of putting a new roof on the house, $170; paying for sawing lumber, $234.08; furnishing labor and materials to install electricity in the house, $120; purchasing a refrigerator, $200; building a garage, $375; purchasing and installing a pump, $10; paying taxes two years, $81.98 for each year; putting a new roof on the smokehouse, $100; grading and graveling a road, $260; purchase of stove wood, $60; and building and installing an outside toilet, $35. Miss Sharp was personally served with summons on May 8, 1959 by the sheriff of the City of St. Louis, apparently while she was in Reyburn's home. On June 11, 1958, the court entered an interlocutory judgment of default, and on June 26, 1958, a final default judgment was taken against Miss Sharp in the amount of $7,-847.96, the full amount prayed for in the petition. Reyburn caused execution to issue to the Sheriff of Montgomery County, and publication of a notice of a sheriff's sale had been commenced when Miss Sharp died on August 28, 1958. The record contains a copy of a demand against her estate by the Lincoln County Memorial Hospital at Troy, Missouri in the amount of $346.95 for services rendered from August 23, to August 28, 1958. Lincoln County adjoins Montgomery County, but there are two counties lying between Lincoln County and St. Louis City. Why Miss Sharp was taken to the Lincoln County hospital in preference to some other hospital, particularly if she was in St. Louis, is not shown.

After the death of Miss Sharp, Reyburn had the judgment, which he had obtained by default, revived and continued as a lien against her real estate, and also had his claim represented by the default judgment allowed as a demand against her estate. The inventory lists as assets in her estate a deposit in the Jonesburg State Bank in the amount of $312.12, which included accumulated interest. No other bank

or savings and loan deposits are listed and there is no explanation in the record of what may have happened to the other two deposits. The only other asset listed in the inventory is "household and kitchen furniture" with a total value of $25.00, including two stoves, a sewing machine, clock, loom and spinning wheel among other items. No refrigerator is listed although Reyburn alleged in his suit against Miss Sharp that he had bought one for her.

On July 20, 1960, Reyburn filed this suit in the Circuit Court of Montgomery County to set aside the deed from Miss Sharp to Mrs. Law executed on March 26, 1957, when she was in the Spires Nursing Home, and alleged as a basis therefor that the deed "was signed and placed of record for the sole purpose of cheating and defrauding plaintiff, who was at the time of the signing of said deed a creditor of Virginia Jane Sharp and had been continuously for eighteen years." The trial court found that Reyburn was a "judgment creditor of the deceased" in the amount of $7,847.-96, which with interest to the date of the decree amounted to $9,358.39; that Miss Sharp executed the deed on March 26, 1957, "with the intent to hinder, delay and defraud her creditor, Thornton Reyburn, * * * from collecting his lawful debt and demand against her, and further * * * that said transfer by deed * * * did include so much of the said Virginia Jane Sharp's property, that it left her without the means to pay her debt to * * * Thornton Reyburn, and was therefore a voluntary conveyance, and * * * that said conveyance is null and void as to the plaintiff, Thornton Reyburn, and as to the amount due the plaintiff, Thornton Reyburn, from the said Virginia Jane Sharp."

We shall first review this case on the theory that the default judgment obtained by Reyburn against Miss Sharp was valid. There is no substantial evidence that at the time of the conveyance of the property either Miss Sharp or Mrs. Law had any actual intent to defraud creditors, including Thornton Reyburn. Within a few days before Miss Sharp executed the deed, acting against her own interest insofar as her application for old age assistance was concerned, she told Miss Franey that she had $1,167.69 in cash, but she said nothing about owing any debts to anyone. It is our definite impression from a reading of the record, albeit this is based somewhat on speculation, that Miss Sharp would have been surprised if then told that Reyburn considered himself to be her creditor. In this circumstance, with Reyburn being a judgment creditor but having obtained that judgment fifteen months after the conveyance which he now attacks, what was he required to prove in this suit in order to entitle him to have the deed set aside? The answer is in Chrisman v. Zeysing, Mo., 209 S.W.2d 144, where it is said: "First, that the conveyance was made for an inadequate consideration; second, that the conveyance rendered the grantor insolvent; third, that plaintiff at the time of the conveyance was a creditor of the grantor."

There admittedly was no consideration in the form of money moving from the grantee to the grantor. Appellants contend that other consideration existed on the basis that Mrs. Law was a creditor of Miss Sharp because she was the owner of an undivided one-half interest in the land and had never received any of the rents and profits therefrom. However, there is no evidence that the rents and profits exceeded the expenses, and we cannot assume that they did. Also, there is no evidence from which it may be inferred that the conveyance to Mrs. Law was intended by either party to be in settlement of a claim by Mrs. Law for her share of the rents and profits. When Miss Sharp entered the nursing home Mr. Law paid a little more than $65 for her care and guaranteed the payment of all money needed in the future. Assuming that this payment and the guarantee established a debt owed by Miss Sharp to Mrs. Law, the amount paid the nursing home would be totally inadequate as consideration to prevent the transfer from being in fraud of other cred-

itors, and when Miss Sharp made the conveyance she knew she was leaving the nursing home and that there would be no need for the guarantee. We can only conclude from the limited evidence before us that the conveyance to Mrs. Law was without consideration or was with inadequate consideration.

■ The second and third elements of the essential proof on the part of Reyburn, that the conveyance rendered Miss Sharp insolvent and that he was a creditor at the time of the conveyance, may be considered together. A few days before the conveyance Miss Sharp had a total of $1,167.69, in cash, or at least she said she did and there is no evidence to the contrary. Whether or not the conveyance rendered her insolvent depends upon whether at that time she was indebted to Reyburn for more than that amount. In the presentation of his case Reyburn took the position that the default judgment was final and conclusive proof of the indebtedness on the part of Miss Sharp to him, not only at the time the judgment was entered but prior thereto. In this respect he was in error. Ordinarily a judgment constitutes proof of a debt only from the time of its rendition. In this case the introduction into evidence by Reyburn of the default judgment constituted proof only that Miss Sharp was indebted to him "at the date when the judgment was rendered" which was fifteen months after the execution of the deed. 37 C.J.S. Fraudulent Conveyances §§ 407 and 417; Jamison v. Bagot, 106 Mo. 240, 16 S.W. 697; Wolcott v. Titus, 238 Ala. 342, 191 So. 383; Bump's Fraudulent Conveyances (4th ed.) § 507. See also Chrisman v. Zeysing, supra, 209 S.W.2d at p. 146, where it was held in a suit to set aside a deed on the ground that it was in fraud of creditors, that a valid judgment obtained against the grantor's estate was conclusive of the existence of a debt owed to plaintiff by the estate, but that "a court of equity was authorized to determine whether, at the time the conveyance was made, the grantor in the deed was

indebted to plaintiff and whether the conveyance rendered the grantor insolvent."

■■ Reyburn offered no evidence of the transaction on which the default judgment was based to show that the debt antedated the allegedly fraudulent conveyance, see 37 C.J.S. Fraudulent Conveyances § 407, unless it can be said that the introduction in evidence of the petition filed by Reyburn in the circuit court constituted proof of the facts therein alleged. The petition constituted a part of the entire file of that case which was offered in evidence by Reyburn with no explanation of the purpose, and which was admitted by the court over several objections of the defendants, none of which was specifically directed to this question, but at least one of which bordered on the issue. Upon proper and adequate objection the petition was not admissible in this proceeding to prove the facts therein alleged, Jamison v. Bagot, supra, and in this equity case where we determine the cause *de novo*, weigh the competent evidence introduced on the factual issues, and reach our own conclusions based on that evidence, Jackson v. Tibbling, Mo., 310 S.W. 2d 909, 914, we decline to accept the allegations of the petition as constituting any proof whatever that the debt antedated the default judgment. We conclude that as the record now stands Reyburn failed to prove, and there is no competent evidence from which it can be inferred, that at the time of the execution of the challenged deed Reyburn was a creditor of Miss Sharp. For that reason there is no competent evidence that the execution of the challenged deed rendered her insolvent.

Ordinarily this case would be remanded to afford Reyburn the opportunity to present proof of what he would contend was the obvious basis for the default judgment. However, to do so without further comment would result in at least tacit approval of the validity of the default judgment and of its use in this case; an approval we expressly decline to give either directly or by inference.

■ Reyburn took the position in the present suit that the default judgment was not subject to attack by Mrs. Law for any reason, and that was the effect of the ruling of the trial court. Although in the trial appellants questioned the propriety of the default judgment, for some unexplained reason they have not adequately preserved for appellate review any specific challenge to that judgment. Because of what we consider to be a situation involving the integrity of the courts and the judicial process, for the purpose of our subsequent comments concerning the default judgment we invoke to such extent as is necessary the application of Civil Rule 79.04, V.A.M.R., which permits this court in its discretion to consider plain errors affecting substantial rights when it deems that manifest injustice or miscarriage of justice has resulted. "The general rule is that when for any reason the judgment against the grantor is invalid the grantee may show its invalidity in a proceeding to set aside the conveyance as fraudulent," and the grantee may show that the judgment "was obtained by fraud or collusion, and that there was no debt or legal obligation or any real cause of action to support the judgment, or that the cause of action accrued under such circumstances that the creditor has no right to impeach the conveyance." 37 C.J.S. Fraudulent Conveyances § 349b. See also 37 C.J.S. Fraudulent Conveyances § 417 concerning the conclusive effect of the judgment in a suit by the judgment creditor against the grantee. It is thus obvious that Mrs. Law was entitled to challenge the default judgment on the basis that it was fraudulently obtained, and for the reasons we now set forth we think the record before us establishes a presumption of fraud.

■ Miss Sharp was born and had lived all her life, except when with Reyburn, on her farm in Montgomery County. In her latter years she apparently was not able to care for herself adequately and her circumstances apparently caused concern among her neighbors and friends. Evidence was offered (but rejected by the trial court upon the objection of Reyburn that it constituted a collateral attack on the default judgment) to the effect that neighbors called the sheriff concerning her circumstances, and at one time a neighbor who had been taking care of Miss Sharp had contacted Miss Franey, the county welfare agent. When Reyburn brought suit against her she was ninety years of age, and in his petition Reyburn alleged that she was and had been feeble for several years. Against her wishes she had been removed from a nursing home by Reyburn and taken to a large city where she had no nearby relative, other than Reyburn, or any friends as far as is shown by the record. It is a reasonable conclusion that if Miss Sharp had desired legal assistance pertaining to the suit filed against her by Reyburn she would not have been able, on her own initiative, to go to a lawyer, relative or friend for advice, but would have had to rely solely on Reyburn. In other words, regardless of her mental condition and her ability to comprehend what was being done, as to which the record is silent, she was physically under the complete and absolute control of her adversary in the lawsuit. It was under these circumstances, insofar as is shown by the record, that Reyburn brought suit against her, had her served with process while she was in his home, and then obtained a default judgment against her based on a claim covering a previous period of seventeen years. We consider that the circumstances establish, as a matter of law, a relationship between Miss Sharp and Reyburn so kindred to confidential or fiduciary that regardless of what it may be termed, it speaks of fraud in the procurement of the default judgment. Not only was Mrs. Law entitled to challenge the default judgment on that ground, when Reyburn comes into a court of equity and relies on that judgment the burden is on him to establish by clear, cogent and convincing evidence that the circumstances under which that judgment was obtained were far different from those now indicated by the record, and that they were such to

overcome the presently existing presumption of fraud.

The judgment is reversed and the cause remanded for further proceedings in accord with the views here expressed.

BOHLING, C., concurs.

BARRETT, C., concurs in the result.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.