**CREDIT RECOVERY SYSTEMS, LLC, Plaintiff,**

v.

**Harry A. HIEKE, Jr., D.P.M., Family Foot Specialists, Ltd., and Sky Financial Solutions Corp., Defendants,**

and

**United States of America, Intervenor.**

**No. CIV A 4:00CV30.**

United States District Court, E.D. Virginia, Newport News Division.

Aug. 9, 2001.

Joshua Michael David, David & Kamp, L.L.C., Newport News, VA, for plaintiff.

Terence Glenn Haglund, Williamsburg, VA, Gary Andrew Mills, Jones, Blechman, Woltz & Kelly, P.C., Newport News, VA, for defendants.

Harry A. Hieke, Jr., Chesapeake, VA, pro se.

Craig Paul Wittman, Office of the United States Attorney, Norfolk, VA, for intervenor.

## OPINION & ORDER

DOUMAR, District Judge.

This matter is before the Court on cross-motions for summary judgment. More specifically, both the Plaintiff in this action, Credit Recovery Systems, LLC ("CRS"), and the Intervenor in this action, the United States of America (hereinafter the "Government") have filed motions for summary judgment adverse to one anoth-er. For the reasons that follow, the Government's Motion for Summary Judgment is **GRANTED,** and CRS's Motion for Summary Judgment is **DENIED.**

## I. *Factual and Procedural Background*

### A. *General Factual Overview*

Defendant Harry A. Hieke, Jr. D.P.M. ("Hieke") is a former doctor of podiatric medicine. While in practice, Hieke did business under the name Family Foot Specialists, Ltd. ("Family Foot"), a Party Defendant in the instant action. Hieke lost his podiatry license in March 1998 following an investigation into Medicare, Medicaid, and CHAMPUS fraud with respect to Hieke's practice. On June 6, 1998, while Family Foot was experiencing in addition to the alleged fraud severe financial and difficulty, Sky/Mid Am Credit Corporation ("Sky/Mid Am")[1] extended a $76,000 loan to Family Foot. Interestingly, around this same time Family Foot came under the management and direction of an entity named Medage, Inc., a Pennsylvania corporation that specializes in assisting podiatry practices. Medage's chief principal is Robert E. DeBiasse ("DeBiasse"), and for sometime prior to June 1998 DeBiasse was attempting to broker Family Foot on behalf of Hieke. Nonetheless, the Sky/Mid Am loan was personally guaranteed by Hieke, Family Foot's principal. Also on June 6, 1998, Family Foot and Hieke entered into a "Secured Finance Agreement" with Sky/Mid Am, pursuant to which Family Foot pledged its assets, including its accounts, as collateral to secure the $76,000 loan. Sometime thereafter, Family Foot defaulted on the $76,000 loan, and

---

1. Sky/Mid Am has since changed its name to Sky Financial Solutions Corporation, one of the Defendants in the instant action.

Sky/Mid Am seized the assets of Family Foot.[2]

On September 1, 1999, Sky/Mid Am sold Family Foot's assets to an entity known as "UPP 003A, LLC," which is the corporate predecessor to the Plaintiff in the instant action, Credit Recovery Systems, L.L.C. ("CRS"). Importantly, both "UPP 003A, LLC" and CRS are owned and controlled by DeBiasse, the same individual that was supposedly managing Family Foot on behalf of Hieke around the time of the June 6, 1998 loan that Family Foot subsequently defaulted on. For purposes of this Opinion and Order, UPP 003A, LLC is hereafter referred to as CRS. CRS paid Sky/Mid Am $45,000 for Family Foot's assets. More specifically, the sale agreement between Sky/Mid Am and CRS included the sale of Family Foot's "accounts (in particular, all receivables paid and unpaid including but not limited to Medicare)." Almost six months later, however, pursuant to a February 22, 2000 settlement agreement in a False Claims Act case brought by the Government against Hieke and Family Foot, both Hieke and Family Foot abandoned all rights to any unpaid Medicare and Medicaid claims that might be due and owing to Hieke and Family Foot. Consequently, CRS has filed the present declaratory judgment action seeking a court order that validates the prior assignments in this case so that CRS may file a claim with the Government for direct payment to CRS of the Medicaid and Medicare receivables that were due and owing to Hieke and Family Foot, regardless of Hieke's and Family Foot's express waiver of any claims with respect to unpaid Medicare and Medicaid receivables.

## B. *Hieke's and Family Foot's False Claims Act Case*

As this brief factual discussion indicates, the instant case is somewhat related to a prior civil action brought by the United States against Hieke and Family Foot in 1999, *United States v. Harry A. Hieke, Jr., D.P.M. and Family Foot Specialists, Ltd.*, Civil Action No. 4:99cv55 (hereinafter *"Hieke I"*). In *Hieke I*, the Government sued Hieke and Family Foot under the False Claims Act for alleged fraudulent billing of Medicare, Medicaid, and Champus claims on at least 273 occasions from May 1993 to September 1995. In December 2000, the Government agreed to settle the False Claims Act case against Hieke and Family Foot in exchange for Hieke and Family Foot, as well as any entity claiming by or through Hieke and Family Foot, abandoning all rights to any unpaid Medicare or Medicaid claims submitted by Hieke and Family Foot from June 1995 to July of 1999.

When CRS learned of the proposed settlement agreement in *Hieke I*, CRS filed a Motion to Intervene in *Hieke I*, claiming that Hieke and Family Foot could not use the outstanding Medicare and Medicaid claims as a bargaining chip to settle the Government's False Claims Act case, since the right to any outstanding Medicare and Medicaid claims that Hieke or Family Foot may have had were now owned by CRS by

---

**2.** The United States disputes that Sky/Mid Am ever "seized" the assets of Family Foot, and cites to Sky/Mid Am's "Customer Service Account Detail" in support of the proposition that Sky/Mid Am never seized the assets of Family Foot. Sky/Mid Am's records somewhat conflict in that one note within the "Customer Service Account Detail" states that Sky/Mid Am sent default notices to Family Foot, while another note states that default notices were not sent because of the potential for settlement. Nonetheless, Sky/Mid Am, in its response to CRS's Requests for Admission, admitted that it did in fact seize the assets of Family Foot. In any event, whether Sky/Mid Am seized the assets of Family Foot is immaterial to the Court's ultimate disposition of this matter.

virtue of CRS's purchase, from Sky/Mid Am, of the assets of Family Foot, including the sale of Family Foot's "accounts (in particular, all receivables paid and unpaid including but not limited to Medicare)." By Order entered February 22, 2000, the Court denied CRS's Motion to Intervene.[3] Also on February 22, 2000, the Court signed and entered the agreed settlement order between the United States, Hieke, and Family Foot whereby Hieke and Family Foot abandoned all rights to any outstanding Medicare or Medicaid claims.

### C. *The Instant Case*

CRS filed the instant declaratory judgment action on February 8, 2000 in the Circuit Court for the City of Newport News. Specifically, CRS's Complaint seeks a court order "stating that CRS is the owner of the Medicare Receivables by virtue of the valid assignment from defendants Hieke and Family Foot to defendant [Sky/]Mid Am and the valid reassignment from defendant [Sky/]Mid Am to UPP 003A, LLC, which has since changed its registered name and is the same entity as CRS." The Complaint alleges the value of the Medicaid receivables at issue to be approximately $170,000. Defendant Family Foot removed the case to this Court on March 14, 2000. By Order entered August 15, 2000, the Court stayed all proceedings in this case pending resolution of *Hieke I* in the Fourth Circuit. Following the Fourth Circuit's resolution of *Hieke I*, the Court returned the instant case to the Court's active docket on February 2, 2001.

What the Plaintiff desires is an order of this Court approving the assignment.

On March 28, 2001, the Government filed a Motion to Intervene, and, on May 24, 2001, CRS filed the instant Motion for Summary Judgment. Sky/Mid Am filed its response to CRS's Motion for Summary Judgment on June 4, 2001, and Hieke and Family Foot filed their opposition to CRS's Motion for Summary Judgment on June 6, 2001. The Government also filed an opposition memorandum to CRS's Motion for Summary Judgment, although it was not a party to this dispute at the time of such filing. On June 13, 2001, CRS filed a reply memorandum to its Motion for Summary Judgment.

The Court held a hearing on the Government's Motion to Intervene and CRS's Motion for Summary Judgment on June 19, 2001. For reasons stated on the record at that hearing, the Court granted the Government's Motion to Intervene and took CRS's Motion for Summary Judgment under advisement. On July 2, 2001, the Government filed its own Motion for Summary Judgment, which the parties have now had an opportunity to respond to. Consequently, this matter has been fully briefed and the written materials were further supplemented through oral argument. This matter is now ripe for disposition.

### II. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no

---

**3.** *See* Order of February 22, 2000, Civ. No. 4:99 cv55. CRS appealed this Court's denial of CRS's Motion to Intervene in *Hieke I* to the Fourth Circuit, and, on October 19, 2000, the Fourth Circuit affirmed this Court's Order of February 22, 2000. Although the Fourth Circuit stated that CRS did have a "significantly protectable interest" in the subject matter of the United States's False Claims Act case against Hieke and Family Foot, the Fourth Circuit nonetheless affirmed the district court "because CRS provided no basis upon which to find that Dr. Hieke's forbearance of his Medicaid and Medicare claims would bind CRS or impede its ability to pursue these claims in a separate action." *United States v. Hieke*, No. 00–1511 (4th Cir. Oct. 19, 2000) (unpublished per curiam opinion).

genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee,* 943 F.2d 366, 368 (4th Cir.1991).

### III. *Analysis*

#### A. *The Declaratory Judgment Act*

The starting point for the Court's analysis of these cross-motions for summary judgment is the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides in pertinent part:

> In any case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether

> or not further relief is or could be sought.

*Id.; see also* Fed.R.Civ.P. 57.

In the instant case, it appears that an actual controversy exists in that CRS claims a right to direct payment of Family Foot's receivables, while both Family Foot and the Government dispute CRS's claim. Thus, a declaratory judgment action is an appropriate vehicle to remedy the alleged harm suffered by CRS. The Court now turns to the issue of whether CRS is entitled to the relief it seeks.

#### B. *The Assignment of Medicaid and Medicare Receivables, Generally*

Before turning to the most important issue in this case-whether or not a nonprovider (such as CRS) can receive direct payments from the Government on the unpaid Medicare and Medicaid claims of a provider (Family Foot)-the Court notes that neither the Medicare nor Medicaid statutes expressly proscribe a provider's assignment of the general right to receive Medicare or Medicaid receivables to a nonprovider. Indeed, all the parties to this dispute agree that straight-forward collateral arrangements (such as where a loan to a provider is secured by Medicare receivables) do not run afoul of any of the federal rules relating to the assignment of Medicare and Medicaid claims. *See, e.g., In re American Care Corp.,* 69 B.R. 66, 67 (Bankr.N.D.Ill.1986). Whether such arrangements are permissible, however, is not the issue in this case. The issue here is whether a provider can effectively assign the right to *direct payment* from the Government, such that CRS could directly receive any Medicare or Medicaid payments that might be due and owing to Hieke or Family Foot. As Family Foot is owed no money from the Government, does CRS's claim rise higher than Family Foot?

**C. *The Medicaid and Medicare Statutes and Regulations Only Permit Direct Payments to an Assignee that are Established by, Pursuant to, or in Accordance with, a Proper Court Order***

■ The Medicare and Medicaid statutes and regulations make clear that an assignee of Medicare or Medicaid receivables may receive direct payment from the Government only where the assignment is established by, pursuant to, or in accordance with an order from a court of competent jurisdiction. *See* 42 U.S.C. § 1395g(c). That statute provides:

> *Payments under assignment or power of attorney.* No payment which may be made to a provider of services under this title for any service furnished to an individual shall be made to any other person under an assignment or power of attorney; but nothing in this subsection shall be construed ... to prevent the making of such a payment in accordance with an assignment from the provider if such assignment is made to a governmental agency or entity or is established by or pursuant to the order of a court of competent jurisdiction ....

*Id.* The regulations closely mirror the statute. *See* 42 C.F.R. § 424.73(b)(2) (stating that "Medicare may pay [direct payments to an assignee] under an assignment established by, or in accordance with, the order of a court of competent jurisdiction"). Thus, like other statutes addressing the assignability of claims against the Government,[4] both the Medicare and Medicaid statutes and regulations at issue in the instant case create a strong presumption against the assignment of claims, unless that assignment "is *established by* or *pursuant to* the order of a court of competent

jurisdiction." 42 U.S.C. § 1395g(c) (emphasis added).

One other source of the confusion in this case must be mentioned. Although it does not carry the same force or authority as the Medicaid and Medicare statutes and regulations, the Government's own "Medicare Carrier's Manual" states as follows:

> A. *General.*–In the past, Medicare benefits have not been subject to levy, attachment, garnishment, or other legal process, except Federal tax levy served by the Internal Revenue Service .... This situation has been changed by section 2 of P.L. 95–142 (the Medicare–Medicaid Anti–Fraud and Abuse Amendments) which provides that, effective for services and care provided after October 25, 1977, the Medicare program shall honor an assignment or reassignment established by, or under order of, a court of competent jurisdiction. This means that the Medicare program (through its carriers and intermediaries) must pay Medicare benefits otherwise due beneficiary, physician, supplier, or provider, or other eligible recipient to another person or organization *if a court possessing jurisdiction over the parties and subject matter before it issues an order assigning or reassigning or validating the assignment or reassignment of those benefits to that other person or organization* .... When properly served with an order meeting these conditions, the carrier will make payment in accordance with the order and advise the beneficiary, physician, supplier, provider, or other eligible recipient of the action being taken.

Pl.'s Ex. F, Medicare Carriers Manual, Part 2, Chapter 4, § 5304 (emphasis added).

---

4. In this regard, *see* 31 U.S.C. § 3727 (limiting the assignment of claims against the Government); 41 U.S.C. § 15 (limiting the assignment of Government contract claims to banks, trust companies, or other financial institutions).

As this discussion makes clear, although the Medicaid and Medicare statutes and regulations only speak of what appears to be a contemporaneous court order *assigning* the right to direct payment of Medicaid and Medicare receivables, the Medicare Carriers Manual appears to allow a court of competent jurisdiction to enter an order *validating* the *prior assignment* of the right to receive Medicare and Medicaid receivables. As this is precisely the order that CRS seeks to obtain in the instant case, the issue therefore becomes whether and under what circumstances the Court may enter such an order pursuant to the Medicare Carrier's Manual.

The parties have not brought any relevant authorities to the Court's attention on this issue, and the Court's independent research failed to yield any cases or regulations discussing the circumstances under which the Court may enter an order either (1) assigning the right to direct payment of a provider's Medicare and Medicaid receivables, or (2) validating a provider's prior assignment of the provider's right to direct payment of Medicare and Medicaid receivables such that the assignee can claim a right to direct payment from the Government of the provider's receivables. Nonetheless, despite the apparent lack of authority on the issue, both the Government and CRS assert several policy arguments that ostensibly support their respective positions.

First, CRS argues that, based on the undisputed facts that (1) Family Foot assigned its Medicaid and Medicare receivables to Sky/Mid Am to collateralize a loan; (2) Family Foot defaulted on the loan; (3) Sky/Mid Am seized Family Foot's assets; and (4) Sky/Mid Am reassigned Family Foot's assets, including the Medicaid and Medicare receivables, to CRS for $45,000; then (5) CRS is the owner of Family Foot's Medicaid and Medicare receivables. CRS further argues that the "Medicare Carrier's Manual" gives the Court broad authority to enter an order *validating* the prior assignment from Family Foot to Sky/Mid Am and the subsequent reassignment to CRS. CRS fails, however, to define what the permissible boundaries of such an order might be. However, Medicare Carrier's Manual is neither a statute nor a regulation. Both the statute and the regulations require that an assignment to be valid must be made "by or pursuant to" a court order. The Medicare Carrier's Manual cannot change or expand a statute or regulation beyond its plain meaning.

The Government makes several arguments against the issuance of such an order. First, the Government correctly contends that neither the relevant statutes nor the regulations promulgated thereunder give the Court any authority to enter an order that *validates* a *prior* assignment, as opposed to *contemporaneously creating* an assignment. Second, the Government contends that a court order validating the prior assignments in this case would open the floodgates to assignees of Medicare receivables who would come to the Court for an order validating a prior assignment in order to receive direct payment of the assignor's Medicare receivables, in contravention of the anti-assignment provisions in the Medicare and Medicaid statutes and regulations, which state that direct payments are only permitted if "established by or pursuant to" a court order. The Government contends that parties to an assignment of Medicare receivables are not free of their own accord to create the kind of relationship necessary to overcome the general anti-assignment provisions in the Medicare and Medicaid statutes, rather, it takes contemporaneous court participation and this Court should not encourage such relationships or the resultant disputes

that might flow therefrom by virtue of the Court's subsequent validation of a prior assignment. Under the Government's reading of the statute, while a provider's former spouse who seeks to have child support payments that are in arrears made current might petition the Court for an order that the provider's Medicare receivables be paid over to the former spouse in the form of child support, a provider cannot simply grant an assignment to an assignee with the assignee/nonprovider subsequently petitioning the Court for an uncontested declaratory judgment that the assignment is valid, and therefore the assignee is entitled to direct payment from the Government of the provider's Medicare receivables.

Although there is scant authority on the issues raised by this motion, the Court finds the Government's argument to be most persuasive. The statute pertaining to the assignment of Medicaid and Medicare receivables creates a strong presumption against assignment, and only permit direct payments to an assignee if the assignment is created by or pursuant to a court order. The plain import of the statutes and regulations is that the Court's order must be entered contemporaneously with the assignment of the right to direct payment, not after-the-fact as CRS posits in the instant case. CRS's reading of the statute would render the anti-assignment provision a nullity. The statutes and regulations do not permit the Court to enter an order that merely validates a prior assignment for past due sums. It is undisputed that in the instant case neither the June 6, 1998 assignment from Hieke and Family Foot to Sky/Mid Am nor the September 1, 1999 assignment from Sky/Mid Am to CRS were "created by" or "pursuant to" an order of a court of competent jurisdiction.

If CRS's argument prevailed, then excluded Medicare providers (such as Hieke and Family Foot in the instant case) could simply sell their Medicare receivables to third-party assignees/nonproviders, including entities potentially controlled by the provider, with the result being that an excluded provider would continue to benefit from the payment of Medicare receivables to the assignee. Therefore, the Court finds that court participation contemporaneous with the establishment of the assignment is required, as per the statutes and regulations, and the Court does not have the authority to enter an order that simply validates a prior assignment so as to allow CRS to claim a right to direct payments on Family Foot's Medicare and Medicaid receivables.

In sum, the June 1998 and September1999 assignments were *not* court-ordered, and nothing this Court can do today can retroactively make it so. A declaratory judgment affirming the validity of either the June 1998 or the September 1999 assignment does not make the assignment "court-ordered" as that phrase is used in the applicable statutes and regulations. Under CRS's theory, a great potential for mischief exists as parties to sham transactions could no doubt cleverly manipulate the facts so as to obtain a "validation" similar to that which CRS seeks in a manner that plainly contravenes the anti-assignment provisions of the statutes and regulations, thereby causing great harm to the public fiscally. Here, Hieke and Family Foot have relinquished all of their rights. Since CRS has only the right to claim through Family Foot, its rights also cease. Consequently, the Government's Motion for Summary Judgment is **GRANTED**, and CRS's Motion for Summary Judgment is hereby **DENIED**.

#### IV. *Conclusion*

For the reasons stated herein, the Government's Motion for Summary Judgment is **GRANTED**, and CRS's Motion for Sum-

mary Judgment is hereby **DENIED.** The Clerk shall enter judgment for the United States.

The Clerk is **DIRECTED** to mail a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**