# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-1086 & 03-3664

DFS SECURED HEALTHCARE RECEIVABLES TRUST,

*Plaintiff-Appellee,*

v.

CAREGIVERS GREAT LAKES, INC.
and MARC LEESTMA

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:99-CV-0569RM—**Robert L. Miller, Jr.**, *Chief Judge*

———————

ARGUED JUNE 10, 2004—DECIDED SEPTEMBER 13, 2004

———————

Before CUDAHY, RIPPLE, and ROVNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. This appeal involves a state law claim under Indiana's Uniform Fraudulent Transfer Act (IUFTA), Ind. Code §§ 32-18-2-1 *et seq.* It has long been argued by some that diversity jurisdiction should be limited or even abolished. The proponents of this view argue that the federal courts are overburdened, that they lack expertise in matters of state law and that in most cases, the concern of hometown bias originally driving the estab-

lishment of diversity jurisdiction represents no real threat to the parties. While we express no opinion as to whether diversity jurisdiction should be limited generally, we have little doubt that this case would have been better brought in an Indiana state court. This case raises numerous novel questions of Indiana state law, upon which federal courts can provide no more than conjecture as to how the Indiana Supreme Court would hold. The appellee, in oral argument, made it clear that it did not want us to certify any question to the Indiana Supreme Court because of the inevitable delay that would follow. However, it was the appellee that chose to file its complaint in federal court and it was that complaint which sought novel remedies, never previously awarded under Indiana law. R. at 36 (Cplt. ¶ 51). Therefore, although we are not fans of delay, it is with limited sympathy that ultimately we must certify several of the questions raised in this appeal to the Indiana Supreme Court. *See Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 418 (7th Cir. 1997).

## I.  BACKGROUND

On May 15, 1996, Caregivers Plus, Inc. (CPI), a provider of home healthcare services to Medicare recipients and others, entered into a "factoring" agreement with DFS Secured Health Receivables Trust (DFS). App. at 63-115. Under this agreement, DFS purchased "the right to receive the proceeds of collections of Healthcare Receivables payable by Governmental Obligors when such collections [were] received by [CPI]" in exchange for immediate cash payments of 71.5% of the value of these receivables to CPI. *Id.* at 165. Additionally, under this agreement, CPI was obligated to pay DFS 2.5% interest for each month that receivables made payable to DFS went unpaid. *Id.* Therefore, in addition to its 28.5% discount on the value of the receivables DFS received, CPI owed DFS 30% annual interest on unpaid receivables. *Id.* at

165. A Monday night quarterback might think this a bad deal for CPI, but it was still Sunday morning, and it apparently looked serviceable to CPI at the time.

By February 1997, however, CPI owed DFS approximately $600,000 under this agreement. *Id.* at 48. On April 4, 1997, DFS filed suit against CPI and its principal, Claudette Harrison, in the Northern District of California to collect the debt. *Id.* at 49. Before the lawsuit began, Harrison admitted converting $250,000 in receivables that should have been paid to DFS. *Id.* at 48-49. The parties executed a settlement agreement and the suit was dismissed voluntarily without prejudice. *Id.* at 394. Following this settlement, DFS continued to purchase CPI's receivables despite the fact that CPI was constantly in default. *Id.* at 166. By the end of 1998, CPI's debt to DFS had grown to approximately $1.7 million. *Id.* at 53. On February 16, 1999, DFS again filed suit against Harrison, CPI and others in the United States District Court for the Eastern District of California and was granted a default judgment for approximately $1.7 million. *Id.* at 49-50, 346-47.

In the meantime, CPI had fallen into financial distress and its officers were concerned that it would go under by the end of 1998 due to its debts. *Id.* at 180. CPI's financial distress was due, in part, to changes in the Medicare program, including the Balanced Budget Act of 1997, which changed the Medicare reimbursement method and led to a 35% drop in spending on home health care agencies that year. *Id.* at 125. As a result, about one-third of Indiana's home health care agencies closed in 1998. *Id.* at 126.

Harrison decided to sell CPI. *Id.* at 368-69. On December 4, 1998, Marc Leestma, an entrepreneur in the home health care business, executed an asset purchase agreement ("APA") for the sale of essentially all of CPI's assets (Medicare provider number, files, furniture and computers) for $20,000. *Id.* at 349-54. The APA defined the "buyer" of CPI's assets as

"Marc Leestma or, at his option, a corporation to be formed by him for purposes of this Agreement." *Id.* at 349. Under the terms of the APA, the buyer purchased CPI's assets and was also required to lease specific property, employ various former CPI employees (including Harrison, whose new salary with CGL was to be even higher than it was with CPI) and assume CPI's equipment leases. *Id.* at 349, 352. Following execution of the APA, on December 8, 1998, Leestma filed articles of incorporation for Caregivers Great Lakes, Inc. (CGL), to be the "buyer" of CPI's assets. *Id.* at 383. On January 8, 1999, CGL paid CPI $20,000 and the transaction was complete. App. at 388. Leestma claims that $20,000 represented the fair market value of CPI and was consistent with other offers Harrison had received during this time period. *Id.* at 194-95. A jury, however, ultimately found that the fair value for CPI's assets was actually $470,000. *Id.* at 301.

Because CGL had purchased CPI's Medicare provider number, Medicare made payments totaling $439,388 to CGL for services provided by CPI prior to the asset purchase. *Id.* at 23. DFS claimed based on its May 15, 1996 agreement with CPI that it should have received these reimbursements. On October 1, 1999, DFS filed a complaint in the Northern District of Indiana claiming fraudulent transfer under the IUFTA, as well as, civil and criminal conversion. After a hearing at which the district court found that DFS was the lawful recipient of the Medicare receivables, CGL paid these funds to DFS. *Id.* at 53.

Nonetheless, DFS maintained its action, claiming that the sale of CPI was a fraudulent attempt to shield CPI's assets from its creditors (DFS). After the district court dismissed the conversion claims, trial began on May 14, 2001. At the close of trial, the jury found that the "reasonably equivalent value" of the assets transferred to CGL was $470,000 (rather than the $20,000 paid by CGL) and recommended

punitive damages of $800,000 against Leestma and $100,000 against CGL. *Id.* at 301. Because the remedy sought was equitable in nature, the district court treated the jury's findings as advisory but ultimately adopted its recommendation. *Id.* at 303, 305-08, 314. On January 9, 2003, after the district court ruled on various post-judgment motions, CGL and Leestma filed a timely notice of appeal.

In this appeal, Leestma and CGL challenge four discrete issues. First, Leestma argues that the district court erred in finding that he could be personally liable under the IUFTA. Second, Leestma argues that DFS did not constitute a "creditor" under the IUFTA because (1) DFS did not obtain its judgment against CPI until after the asset transfer; and (2) its contract with CPI was void since the sale of Medicare receivables is illegal. Third, Leestma argues that a money judgment is not available under the IUFTA when the transferred assets are available for reconveyance. Finally, Leestma appeals the district court's award of punitive damages, arguing that such damages are not available under the IUFTA.

## II.  DISCUSSION

### A.  Leestma's personal liability

Leestma argues that the district court erred in holding him personally liable, because under the IUFTA, a judgment may be entered only against a "first transferee" of fraudulently transferred assets or "a person for whose benefit the transfer was made," and Leestma claims to be neither. *See* Ind. Code § 32-18-2-18(b)(1). According to Leestma, CGL—the corporation he created to purchase CPI's assets—was the "first transferee" of those assets, and Leestma acted as a mere agent of CGL. Therefore, he argues that because DFS did not attempt to pierce the corporate veil of CGL, he cannot be held personally liable.

We agree that a "transferee" is one with actual "dominion" or "control" over the assets in question. *See Bonded Fin. Servs., Inc.*, 838 F.2d 890, 893-94 (7th Cir. 1988).[1] " 'Control' does not mean the ability to steal the money, or use it for personal purposes in breach of duty." *In re Schick*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999). A "transferee" must have "the right to put the money to one's own purposes," rather than merely being an "agent," "possessor" or someone "who touches the money." *Bonded Fin. Servs., Inc.*, 838 F.2d at 893-99.

On December 4, 1998, the parties entered into an APA, under which the "buyer," defined as "Marc Leetsma [sic] or, at his option, a corporation to be formed by him for purposes of this Agreement," agreed to purchase CPI's assets for $20,000. *See* App. at 349. The district court concluded that because Leestma signed the APA in his own name, he was not an agent and that he personally became the "first transferee" of the assets. *See* Short App. at 15 ("Evidence supports a finding that Mr. Leestma is personally liable for buying fraudulently discounted assets—it was he who signed the asset purchase agreement—so Mr. Lesstma [sic] is not entitled to dismissal of the fraudulent transfer claim against him.")

Of course, under Indiana law (and likely in any other state), the mere fact that a person signs an agreement in

---

[1] The IUFTA does not define the term "transferee." The historical notes to the IUFTA indicate that the relevant section is based on § 8 of the Uniform Fraudulent Transfer Act (UFTA). *See* UFTA (U.L.A.) § 8, cmt. 1; *see also Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, No. 1:03-CV-0123-DFH, 2004 WL 771230, at *14 n.7 (S.D. Ind. March 24, 2004) (noting that Indiana has adopted the UFTA). Section 8 of the UFTA is based on § 550 of the Bankruptcy Code. *Compare* UFTA § 8, cmt. 2 *with* 11 U.S.C. § 550. In *Bonded Financial Services*, this court was interpreting the term "transferee" in the context of § 550 of the Bankruptcy Code. *See* 838 F.3d at 395.

his own name does not preclude a finding that he signs in an agency capacity. *See, e.g., Stepp v. Duffy*, 654 N.E.2d 767, 773 (Ind. Ct. App. 1995). A fair reading of the APA suggests that the parties always intended that the buyer would be CGL rather than Leestma personally. First, the APA's definition of "buyer," which contemplates that no corporation had yet been established but that one might be, not only suggests that Leestma could be signing as an agent for a future corporation but also made it awkward for Leestma to sign anything other than his name. *See* App. at 349. It was not likely that Leestma would sign "Marc Leestma, as president of the company which will be formed by him for purposes of this agreement." More importantly, however, the APA incorporated by reference (and the asset transfer was conditioned on executing) certain employment agreements and a lease agreement, which were apparently attached to it. *Id.* at 352 ("The transaction contemplated by this agreement is conditioned upon the Buyer signing a five (5) year employment contract . . . in the form of Exhibits 'A-1' and 'A-2' attached hereto.") These agreements, which did not include the same awkward "buyer" definition, were made out by "Caregivers Great Lakes" (CGL) and signed by "Marc Leestma, President." *Id.* at 355-64, 371.[2] Therefore, viewing the APA as a whole, it is clear that Leestma was signing as an agent for CGL, and the parties intended that CGL be the purchaser. Therefore, had a transfer taken place upon the signing of the APA, CGL would be the "first transferee" and Leestma, a mere agent.

However, even if CGL were the "first transferee," it would not alter the outcome in this particular case, because CGL

---

[2] It is not clear whether these attachments were executed contemporaneously with the APA (it appears that at least the typed "Marc Leetsma [sic], President" line was present on December 4, 1998), but that is not relevant because they were incorporated by reference into the APA, regardless whether they were executed subsequently thereto.

was not legally incorporated until January 1, 1999. *See id.* at 383 (articles of incorporation signed December 8, 1998, but including a delayed effective date of January 1, 1999); Ind. Code § 23-1-21-3(a); Ind. Enc. Corporations § 8 ("*Unless a delayed effective date is specified*, a corporation's existence begins when the articles of incorporation are filed.") (emphasis added).[3] Therefore, there would be no need for DFS to pierce the corporate veil, as CGL was not yet wearing one. Leestma could be personally liable whether he was the "first transferee" or not.

Leestma may yet be saved, however, because although the parties had signed the APA, that alone was not enough to cause a "transfer" to occur in this case. An obvious implicit requirement to being a "first transferee" is that a "transfer" of

---

[3] Leestma properly has not argued that CGL was a *de facto* corp-oration under Indiana law beginning on December 8, 1998, when he signed and presumably filed CGL's articles of incorporation. *See* Ind. Enc. Corporations § 9 (defining a *de facto* corporation as "one which exists for all practical purposes, but is not strictly speak-ing a legal corporation because of a failure to comply with some legal formality in organization"). Such argument would be una-vailing. Of course, if the transfer occurred on December 4, 1998, which is implicit in the district court's holding (though incorrect), this argument would be of no help to Leestma because he would have had control of the assets on December 4,1998—four days before even *de facto* status. Regardless, we do not believe that signing the articles of incorporation was enough to create a *de facto* corporation under Indiana law, where the incorporator and sole shareholder (Leestma) clearly intended that incorporation be effective at a later date. *See, e.g., Sunman-Dearborn Cmty. Sch. Corp. v. Kral-Zepf-Freitag & Assocs.*, 338 N.E.2d 707, 709-10 (Ind. Ct. App. 1975). The record leaves no doubt that Leestma's intent was always that CGL would become effective on January 1, 1999. Moreover, *de facto* status would not shield an officer from liability where, as here, he has been found to have engaged in fraud. *See id.*; *Jennings v. Dark*, 92 N.E. 778, 783 (Ind. 1910); *Aetna Life Ins. Co. v. Weatherhogg*, 4 N.E.2d 679, 682 (Ind. App. 1936).

legal rights has taken place. *See Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996) ("Determining the initial transferee of a transaction is necessarily a temporal inquiry; there must be a transfer before there can be a transferee."); *see also* Ind. Code. § 32-18-2-10 (noting that a transfer must involve the "disposing of or parting with an asset or an interest in an asset"). Therefore, we must determine when a transfer of legal rights occurred under the facts of this case. The answer will lie with the parties' intent.[4]

---

[4] One might think that the logical way to decide when this transfer was made would be by considering the IUFTA section titled "when a transfer is made." *See* Ind. Code § 32-18-2-16. This approach is wrong, however, as that section is intended to be used to determine when a cause of action arises and provides no useful answer in this case. *Cf.* UFTA § 6, cmt. 1. According to this section, a transfer is made with respect to an asset that is not real property "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien (other than under this chapter) that is superior to the interest of the transferee." Ind. Code § 32-18-2-16. Although the term "perfected" is not defined, the comments to the UFTA suggest that the parties are to look to Article 9 of the Uniform Commercial Code (UCC) for guidance as to the meaning of the term. *See* UFTA § 6, cmt. 1. The valuable assets in this case would be considered "general intangibles" under Indiana's version of Article 9 of the UCC. *See* Ind. Code § 26-1-9.1-102(a)(42); *In re Leasing Consultants Inc.*, 486 F.2d 367, 371 n.5 (2d Cir. 1973) (noting that "general intangibles" include goodwill); *State St. Bank & Trust Co. v. Arrow Communications, Inc.*, 833 F. Supp. 41, 48 (D. Mass. 1993) (noting that "general intangibles" includes a "governmental license"); App. at 352 (defining the value of the Company in relation to its goodwill and certification). In order to perfect a security interest in such assets, a financing statement must be filed with the state filing office. *See* Ind. Code § 26-1-9.1-310, cmt. z. There is no evidence that a filing statement was ever filed in this case. Therefore, assuming that the applicable law would permit the transfer of a Medicare provider number

(continued...)

The APA, signed on December 4, 1998, states that "[s]ubject to the terms and conditions hereinafter set forth, the Company agrees to sell assign, transfer and deliver to the Buyer *at the Closing provided for hereafter*, all of the . . . assets." App. at 349 (emphasis added). The APA further states that "[t]he purchase price for the [a]ssets shall be . . . in immediately available funds at the [c]losing." *Id.* The closing date was set under the APA for December 22, 1998. *Id.* at 353. The APA, however, does not suggest that time was of the essence. *See Smith v. Potter*, 652 N.E.2d 538, 542 n.4 (Ind. App. 1995) ("Indiana cases discussing time of the essence clauses provide that courts do not generally view time as being of the essence of a contract unless the terms of the contract or the conduct of the parties make it so."). The text of this agreement therefore makes it clear that the parties had entered into an executory agreement and that ownership (the right to legally control the assets) would transfer on December 22, 1998, or at such time as consideration was paid.

Further evidence that the parties did not intend an immediate transfer of assets comes from a letter dated December 15, 1998, in which CPI provided the requisite notice to Department of Health and Human Services and indicated that "a new corporation," CGL was to be the new owner of the Medicare provider number. App. at 385; *see also* 42 C.F.R. § 489.18(b) ("[a] provider who is *contemplating or negotiating* a change of ownership must notify" the Department of Health and Human Services) (emphasis added). This letter, dated eleven days after the APA was signed, stated that CPI was "*in the process of* selling its assets" rather than that it

---

[4] (...continued)
to be perfected, "the transfer is considered made immediately before commencement of the action." *Id.* at 32-18-2-16(2). Clearly, that result does not help us to determine when either Leestma or CGL obtained legal control of these assets.

had sold its assets. App. at 385 (emphasis added).

Because the APA was an executory contract not governed by the UCC, neither Leestma nor CGL was given ownership in or the legal right to control any asset under the APA until the parties so intended.[5] *See First Nat'l Bank v. Smoker*, 286 N.E.2d 203 (Ind. Ct. App. 1972) ("Prior to the adoption of the Uniform Commercial Code, ownership of goods and the rights incident thereto were defined by the location of title and the intention of the parties was the primary test as to who had title."); *Webb v. Clark County*, 87 Ind. App. 103, 159 N.E. 19, 20-21 (Ind. Ct. App. 1927) (holding that an agreement which gives the buyer the right to property in the future is executory and title does not pass

---

[5] We need not consider how this agreement might be interpreted under the UCC, as the UCC does not apply to this contract for the sale of a business containing predominantly intangible assets, such as a governmental license and goodwill. *See Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 553-54 (Ind. 1993) (applying the "predominant thrust" test to a contract for the sale of "goods" and non-goods); *Baker v. Compton*, 455 N.E.2d 382, 387 (Ind. Ct. App. 1983) (same); *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 530 (7th Cir. 1999) (same); *D.G. Porter, Inc. v. Fridley*, 373 N.W.2d 917, 924 (N.D. 1985) (holding that the North Dakota UCC did not apply to the sale of a bar business where the essential elements of the sale involved goodwill, transfer of liquor license, assignment of a lease, and transfer or assignment of insurance policies and contracts related to the business); *Foster v. Colorado Radio Corp.*, 381 F.2d 222, 226 (10th Cir. 1967) (finding that the sale of a license, goodwill, real estate and a studio's transmission equipment were not movables and hence not "goods" within the meaning of UCC); *Stewart v. Lucero*, 918 P.2d 1, 4-5 (N.M. 1996) (applying a "primary purpose test" to a sale of a catalog business, where, although display items and some inventory was sold, the basis of the bargain was the right to use the Sears name and a noncompetition agreement).

until the parties comply with terms of the contract); *Branigan v. Hendrickson*, 46 N.E. 560, 561 (Ind. App. 1897) ("In [the] case of [an] executory contract, the purchaser does not become the owner; [the property to be sold is] not at his risk. His remedy, if there be a breach, is confined to an action for damages. Whether any particular contract is one or the other is, generally, a question of fact depending upon the intention of the parties, to be gathered from the terms and stipulations of the agreement."); *Keck v. State ex rel. Nat'l Cash-Register Co.*, 39 N.E. 899, 900-01 (Ind. App. 1895) (noting that petitioner "only contracted for an interest at some time in the future, when he had complied with certain conditions. Such an interest is not subject to levy and sale"); *see also Bradley v. Michael*, 1 Ind. 551 (Ind. 1849); *Frame Station, Inc. v. Indiana Dep't of State Revenue*, 771 N.E.2d 129, 131 (Ind. Tax.Ct. 2002) ("The transfer of property occurs when the buyer agrees to buy property from a seller, pays the purchase price, and takes ownership and possession of the property.").

Although the closing was originally scheduled by the APA to take place on December 22, 1998, it appears that nothing actually happened on that date. *See* Tr. Vol. 3 at 130. The record is devoid of information about when any of the tangible assets were physically transferred but, in any case, it is the legal right to control the asset, not physical possession, which matters under *Bonded Financial Services*. *See* 838 F.2d at 893-94.[6] Moreover, the parties agreed in the APA

---

[6] The only evidence presented to suggest that Leestma or CGL took physical possession of any asset before December 22 was the following testimony from trial. Leestma was asked: "After you signed the Asset Purchase Agreement on December 4th of 1998, there was actually no closing. Was there?" Leestma responded: "I think about the only thing that remained to be done was the passing of the check, to pay the money." Tr. Vol. 3 at 130. This is,

(continued...)

and at oral argument that the real value of this transaction was in the intangible assets. App. at 352 ("The parties to this Agreement acknowledge that the value of the Company is its certification and good will."). As we have noted, the parties intended that the legal right to control the assets would shift when value was paid. This occurred on January 8, 1999, when CGL issued a check. App. at 388. Therefore, it is clear that CGL gained the right to control these assets on January 8, 1999, and is thus the "first transferee."

The fact that Leestma is not the "first transferee" under the IUFTA, however, does not necessarily mean that the only way he can be personally liable is by piercing CGL's corporate veil. Under Indiana state law, an officer or shareholder of a corporation can be held individually liable, without the need to pierce the corporate veil, if he personally participates in the fraud. *See State Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000) (citing *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996) ("It is well-settled that a corporate officer cannot escape liability for fraud by claiming that he acted on behalf of the corporation when that corporate officer personally participated in the fraud.")); Ind. Code § 23-1-26-3(b) (Business Corporations Act) ("Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation *except that the shareholder may become personally liable by reason of the shareholder's own acts or conduct.*") (emphasis added); Ind. Enc. Corporations § 120. This well-established principle of Indiana law has been applied not just in common law fraud actions, but in other statutory and

---

6  (...continued)
at best, weak evidence that there was a physical transfer of assets before December 22. If anything, it simply reinforces the idea that the parties defined the closing as the time at which consideration would be paid.

common law causes. *See*, *e.g.*, *Roake v. Christensen*, 528 N.E.2d 789, 791 (Ind. Ct. App.1988) (finding defendant individually liable for fraud in connection with his criminal conversion in violation of Ind. Code § 35-43-4-3); *Berghoff v. McDonald*, 87 Ind. 549 (Ind. 1882) (holding an agent personally liable in an action of replevin for the unlawful taking or detention); *American Indep. Mgmt. Sys. v. McDaniel*, 443 N.E.2d 98, 103 (Ind. Ct. App. 1982); *Stoutco, Inc. v. AMMA, Inc.*, 620 F. Supp. 657, 661 (D. Ind. 1985) ("In Indiana, the law is also clear that a corporate officer or shareholder is not shielded from liability on the basis of his representative capacity when he participates in a tort because an agent is liable for his own torts."); *In re Mills*, 111 B.R. 186, 195 (Bankr. N.D. Ind. 1988) ("[W]hen a personal debtor who, as an officer of a corporation, actually participates in the conversion of property which is subject matter to the security interest of a third party, he is personally liable to said party and thus the debt is nondischargeable pursuant to § 523(a)(6).").

No court has yet considered whether this Indiana common law rule can be applied to the IUFTA.[7] There is good reason

---

[7] We believe that *Stepp*, 654 N.E.2d 767, provides little insight into this question. In *Stepp*, the question was raised as to whether an officer of a corporation who was not a "transferor," as required under the Federal Odometer Act (FOA), could be held personally liable for an FOA violation, given that he personally participated in the fraud. *Id.* at 774. The court did not directly answer the question because it found that the officer was liable under other theories. However, even if there are some tea leaves to read from *Stepp*, we believe that case is distinguishable. Under the relevant section of the FOA, only a "transferor" can engage in fraudulent conduct. *See id.* at 773 (noting that the FOA requires "any *transferor* to give . . . written disclosure to the transferee [of the cumulative mileage registered on the odometer].") (emphasis added). Therefore, the Indiana court may have felt that if the corporate

(continued...)

to believe it would apply, however. First, Indiana seems to treat claims under the IUFTA as a type of fraud claim. *See, e.g., Fire Police City County Federal Credit Union v. Eagle*, 771 N.E.2d 1188, 1191 (Ind. Ct. App. 2002) (treating a claim under Ind. Code § 32-2-7-15 as a fraud claim); Bruce Markell, *The Indiana Uniform Fradulent Transfer Act Introduction*, 28 Ind. L. Rev. 1195, 1200 (1995) ("Indiana statutes require a finding that fraud existed in connection with a transaction challenged as a fraudulent transfer."). Second, the IUFTA itself expressly incorporates principles of common law fraud by reference. Ind. Code § 32-18-2-20. Finally, at least one other court has applied similar common law to find the president of a corporation personally liable under another state's version of the UFTA, despite the fact that he was not a "first transferee." *See Firstar Bank, N.A. v. Faul*, No. 00-C-4061, 2001 WL 1636430, at *7 (N.D. Ill Dec. 20, 2001).

At least one state with a similar common law rule, however, has declined to hold an officer who personally participated in fraud liable under the UFTA. *See Kondracky v. Crystal Restoration, Inc.*, 791 A.2d 482, 483 (R.I. 2002). While *Kondracky* did not specifically discuss or necessarily consider what effect Rhode Island's common law "personal participation" rule would have on the UFTA, a Rhode Island district court later felt constrained by *Kondracky* and held

---

[7] (...continued)
officer was not a "transferor" in *Stepp*, she had no obligation to disclose under that section of the FOA, and thus her failure to disclose could not represent personal participation in the fraud. In contrast, the fact that a person is not a "first transferee" under the IUFTA does not suggest that he has not engaged in fraudulent conduct, but simply that no "judgment may be entered against [him]." Ind. Code. § 32-18-2-18(b)(1). Moreover, unlike the IUFTA, the FOA is a federal statute, not expressly intended to be interpreted according to Indiana common law principles of fraud. *Cf.* Ind. Code § 32-18-2-20 (incorporating the principles of common law fraud into the IUFTA).

that the common law would not expand liability under the UFTA. *See Rohm and Haas Co. v. Capuano*, 301 F. Supp. 2d 156, 160-61 (D.R.I. 2004) (criticizing *Firstar*). The court in *Rohm* also noted that "most courts have been reluctant to extend the reach of fraudulent conveyance actions as to include parties that are only participants in a fraudulent transfer." *Id.* at 161 (compiling cases).

We do not share the concerns of the Rhode Island District Court, at least with respect to this case. The cases upon which it relies do not involve officers, directors or shareholders of the "first transferee," who personally participated in the fraud. Instead, they involve novel claims of accessory, conspiracy or aiding and abetting liability under the UFTA. *See Lowell Staats Mining Co. v. Phila. Elec. Co.*, 878 F.2d 1271, 1276 n.1 (10th Cir. 1989) (declining to extend UFTA to find "aiding and abetting" liability against an agent of the corporation, where it seems the agent was not an officer, director or shareholder); *Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984) (declining to extend UFTA to individuals who participated in a conspiracy to commit a fraudulent transfer); *Thompson Kernaghan & Co. v. Global Intellicom, Inc.*, No. 99 CIV. 3005(DLC), 1999 WL 717250, at *2 (S.D.N.Y. Sept. 14, 1999) (declining to apply an accessory liability theory to a lawyer of "first transferee" who helped set up the corporation involved). Therefore, these cases are not on point.

In contrast, we are aware of no case suggesting that "veil piercing" is impermissible under the UFTA.[8] Liability for officers or shareholders of a "first transferee" who personally participated in the fraud is a substitute for "veil piercing," not an extension of who can be a "transferee" under the UFTA. Moreover, the reasoning behind the general rule that courts should avoid extending the parties who can be

---

[8] Leestma, in fact, concedes that veil piercing is permissible under the UFTA. *See* Leestma Br. at 29.

a "transferee" under the UFTA appears to be based, at least in part, on the difficulty of proving damages. *See Duell v. Brewer*, 92 F.2d 59, 61 (2d Cir. 1937) ("[C]ourts have generally held as to fraudulent conveyances that a person who assists another to procure one, is not liable in tort to the insolvent's creditors . . . . The reasons ordinarily given are the impossibility of proving any damages, which scarcely seems sufficient; but the result is settled, at least for us.") (cited by *Lowell Staats Mining Co.*, 878 F.2d at 1276). We do not believe that there would be any such difficulty here, where joint and several liability would clearly be appropriate.

Finally, this case is somewhat unique in that, because punitive damages were sought (rightly or wrongly), we have an actual jury finding that Leestma personally participated in fraudulent conduct, in addition to the general finding of liability under the UFTA. App. at 312 ("In deciding the issue of punitive damages, though, the jury found by clear and convincing evidence that *both* defendants [Leestma and CGL] acted with malice, fraud, gross negligence, or oppressiveness.") (emphasis added); App. at 302 (verdict form). Therefore, we see no reason that the rule should not be extended in this case.

Nonetheless, given that we cannot avoid certifying two other questions to the Indiana Supreme Court (see *infra*), in an abundance of caution, we do so here as well. Therefore, we hereby certify to the Indiana Supreme Court the question whether an officer or director of a "first transferee" under the IUFTA who is found to have personally participated in the fraud can be held personally liable under Indiana law on that basis alone.

B.   DFS as "creditor"

The appellants' second argument is that the district court erred in finding DFS to be a "creditor" under the IUFTA.

According to the appellants, DFS was not a "creditor" under the IUFTA because (1) DFS did not obtain its judgment against CPI until after the asset transfer; and (2) its contract with CPI was void as the sale of Medicare receivables is illegal. Leestma Br. at 50-51. Both arguments are without merit.

We start with the appellants' argument that DFS is not a "creditor" because DFS did not obtain its judgment against CPI until after the asset transfer. The appellants' argument, properly articulated, does not have to do with whether DFS is a "creditor" as defined under section 4 of the IUFTA, but whether DFS is a "present creditor" under section 15 of the IUFTA ("Transfers fraudulent as to present creditors"). Reply Br. at 21. Section 15 notes that "[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor *whose claim arose before the transfer was made or the obligation was incurred*" if certain specified conditions are met. Ind. Code § 32-18-2-15 (emphasis added).

Although DFS did not receive a court judgment until after the asset transfer, the court judgment simply made official the obligation with respect to which DFS had been trying to recover long before the asset transfer. The appellants have presented no evidence to suggest that this debt did not arise before the fraudulent transfer. The IUFTA definition of a "claim" makes it clear that a "claim" is a right to payment "whether the right is reduced to judgment or not. . . ." *Id.* at 32-18-2-3. Therefore, the fact that DFS did not receive a court judgment until after the asset transfer is not relevant to the inquiry.

Nor did the district court err in considering the court judgment in deciding that DFS was a "present creditor" under the IUFTA, given that the judgment evidenced the pre-existing debt and the appellants presented no evidence to the contrary. In fact, it appears that the appellants never made the argument below that DFS's claim did not arise

before the transfer or that DFS was not a "present creditor." *See* Reply Br. at 20. This argument is raised for the first time on appeal and is thus waived. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 568 n.3 (7th Cir. 1995). In any event, even if the appellants had properly made this argument below, and had presented compelling evidence that DFS's claim (not just its judgment) arose after the transfer, they would presumably still be liable under section 14 of the IUFTA which applies regardless of "*whether the creditor's claim arose before or after the transfer was made* . . . if the debtor made the transfer . . . with the actual intent to hinder, delay, or defraud any creditor of the debtor . . . ." Ind. Code § 32-18-2-14 (emphasis added).

With respect to the appellants' second contention, they argue that DFS's contract with CPI, in which DFS purchased "the right to receive the proceeds of collections of Healthcare Receivables payable by Governmental Obligors when such collections [were] received by Provider" is void for illegality. App. at 115. Essentially, the appellants' argument is that the "factoring" agreement violates 42 U.S.C. § 1395g(c) which states that "no payment which may be made to a provider of services under this title . . . for any service furnished to an individual shall be made to any other person under an assignment or power of attorney . . . ." *See also* 42 U.S.C. § 1396a(a)(32); 42 CFR § 424.73. Although it is reassuring to see that at least one issue of federal law managed to creep its way into this appeal, the appellants' argument is without merit.

On its face, this statute stands only for the proposition that Medicare funds cannot be paid directly by the government to someone other than the provider, but it does not prohibit a third party from receiving Medicare funds if they first flow through the provider. Before this statute, health care providers assigned their right to Medicare receivables to third parties which then submitted incorrect and inflated claims to be paid in their own names, creating administra-

tive nightmares and overpayments in excess of one million dollars. H.R. REP. NO. 92-231 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5090. Therefore, Congress passed this statute to remedy this problem by ensuring that payments would be made directly to healthcare providers. However, nothing suggests that Congress intended to prevent healthcare providers from assigning receivables to a non-provider. *Id.* ("[The] committee's bill would not preclude a physician or other person who provided the services and accepted an assignment from having the payment mailed to anyone or any organization he wishes, but the payment would be to him in his name.").

The appellants cite no case and we have uncovered none, which interprets this statute to prohibit a provider's assignment of Medicare or Medicaid receivables to a non-provider. If anything, case law suggests the opposite. *See, e.g.*, *In re Missionary Baptist Found. of Am.*, 796 F.2d 752, 759 (5th Cir. 1986) (holding that a creditor could collateralize its loan to the debtor by an assignment of the debtor's accounts receivable due from medical care payments under 42 U.S.C. § 1396(a)); *Credit Recovery Sys., LLC v. Hieke*, 158 F. Supp. 2d 689, 693 (D. Va. 2001) ("[T]he Court notes that neither the Medicare nor Medicaid statutes expressly proscribe a provider's assignment of the general right to receive Medicare or Medicaid receivables to a nonprovider. Indeed, all the parties to this dispute agree that straight-forward collateral arrangements (such as where a loan to a provider is secured by Medicare receivables) do not run afoul of any of the federal rules relating to the assignment of Medicare and Medicaid claims."); *see also In re Am. Care Corp.*, 69 B.R. 66, 67 (Bankr. N.D. Ill. 1986) (same); Intermediary Medicare Manual, Part Three, Ch. Five § 3488(C), Sept. 4, 2002, http://www.cms.hhs.gov/manuals/ 13_int/a3488.asp ("These provisions preclude Medicare payment of amounts due a provider or other person to a person or entity furnishing financing to the provider, *whether the provider sells*

*his/her claims to that person or entity or pledges them to that person or entity as collateral on a loan.*") (emphasis added). Further, the record suggests that Medicare was aware of this agreement between DFS and CPI, at least *post facto*, and other than disallowing a $380,000 claim for the interest on the obligation, there is no evidence that it expressed any disapproval of the arrangement. App. at 282. Therefore, we remain unconvinced that this "factoring" agreement between DFS and CPI was illegal.

In any case, it is doubtful that Leestma and CGL, non-parties to this fully executed contract, have standing at this late date to argue that the contract is void for illegality. The appellants draw our attention to "the general rule" stated in Corpus Juris Secundum that "when for any reason the judgment against the grantor is invalid the grantee may show its invalidity in a proceeding to set aside the conveyance as fraudulent." Reply Br. at 22 (quoting 37 C.J.S. Fraudulent Conveyances § 257). The appellants, however, cite no law from Indiana, and it is not obvious that Indiana's rule would necessarily mirror the rule stated in Corpus Juris or that it would apply specifically to "illegal" contracts. *See Stolz-Wicks, Inc. v. Commercial Television Serv. Co.*, 271 F.2d 586, 589 (7th Cir. 1959) ("In the absence of any express holding in Indiana or Illinois, 'the rule that the law will not enforce an illegal contract has application only between the immediate parties to the contract,'. . . is sound and applicable. Hence, it follows that one in possession of the fruits of an illegal transaction to which he was not a party cannot invoke the defense of illegality.") (citation omitted). However, even if we were to treat Corpus Juris as gospel, the appellants ignore the exception to "the general rule" reported in Corpus Juris immediately subsequent:

> Where the judgment against the debtor has been rendered in the regular course of judicial proceedings by a court of competent jurisdiction and it cannot be objected to on the ground that it was obtained by fraud or

> collusion, *it is*, whether rendered on default or after contest, *conclusive* as to the relation of debtor and creditor between the parties and the amount of the indebtedness, and *cannot* be collaterally impeached by the grantee of the debtor in a suit to set aside the conveyance as fraudulent.

37 C.J.S. Fraudulent Conveyances § 257 (emphasis added). Here, the judgment against CPI was rendered in the course of a judicial proceeding. The appellants do not argue that the court that rendered the judgment lacked jurisdiction, that there were defects in the proceedings or that the judgment was obtained by fraud or collusion. Therefore the appellants present no basis upon which the judgment can be attacked. *See Scott v. Indianapolis Wagon Works*, 48 Ind. 75, 75-77 (Ind. 1874) (finding that in suit by a judgment creditor to set aside fraudulent conveyance, a grantee cannot call a judgment into question by raising matters which might have been defenses to the action in which the judgment was rendered); 14 Ind. Enc. Fraudulent Conveyances § 47 ("Matters which have no bearing on the issues in the suit to set aside the conveyance as fraudulent cannot be urged as a defense thereto.") (citing *Scott*).[9]

---

[9] The cases from other jurisdictions upon which the appellants rely are distinguishable in that they fit into the exception discussed in Corpus Juris. Reply Br. at 22, citing *Reyburn v. Spires*, 364 S.W.2d 589, 594 (Mo. 1963) (allowing the grantee "to challenge the default judgment on the basis that it was *fraudulently obtained*") (emphasis added); *Tanner v. Wilson*, 17 S.E.2d 581, 584 (Ga. 1941) (suggesting that the grantee "may defend an action against him *by showing defects in the proceedings*") (emphasis added); *Davis v. Davis*, 25 P. 140 (Or. 1890) ("A grantee whose deed is attacked for fraud by one claiming to be a judgment creditor of his grantor may plead the statute of limitations against the debt *before it becomes merged in the judgment* . . . .") (syllabus by the court) (emphasis added).

Finally, as a technical matter, even if the appellants had standing to attack the validity of this contract, this would not change DFS's status as a "creditor" under the IUFTA. A "creditor" with a colorable claim cannot lose its status as "creditor" under the IUFTA simply because the debtor or a third-party has a legal defense to the claim. The statute itself defines "creditor" as "a person who has a claim," Ind. Code § 32-18-2-4, and notes that a "claim" under the statute "means a right to payment, whether the right is . . . disputed or undisputed . . . ." *Id.* at 32-18-2-3. Therefore, the fact that the appellants may dispute the claim would not change DFS's status as a "creditor."

## C.   Money damages under the IUFTA

The appellants next argument is that a money judgment is not available under the IUFTA when the transferred assets are available for reconveyance.[10] Leestma Br. at 30.

---

[10] During the pendency of this appeal, we remanded this case to the district court "for the limited purposes of determining whether voiding the transfer and reconveying the transferred assets would provide adequate remedy in lieu of monetary damages." In an order dated July 12, 2004, the district court responded and indicated its belief that reconveyance would not provide an adequate remedy because (a) reconveyance would simply shift the assets from CGL to CPI (rather than DFS); (b) CPI may not remain in existence and even if it does, it may not be in the home health care business; and (c) DFS is not in the home health care business. In hindsight, it appears that our instructions may have been unclear. Our question assumed that under the IUFTA a court could order the assets to be conveyed directly to DFS or could be held for DFS's benefit—an assumption neither party contested on appeal. *See* Leestma Br. at 33 ("[T]he assets were and are available to be returned to CPI for the benefit of DFS"); DFS Br. at 14-25. Therefore, we were simply asking for a factual finding as
(continued...)

The IUFTA specifically discusses the "[r]emedies of a creditor" and notes that:

> (a) In an action for relief against a transfer or an obligation under this chapter, a creditor, subject to the limitations in section 18 of this chapter, may obtain any of the following:
>
>> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.
>>
>> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by IC 34-25-2-1 or any other applicable statute providing for attachment or other provisional remedy against debtors generally.
>>
>> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, any of the following:
>>
>>> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred, its proceeds, or of other property.

---

[10] (...continued)

to whether the assets are *available* in substantially the same form as they were when they were transferred. If they are, we see no reason that the Court cannot order that they be transferred to DFS or held for the benefit of DFS. The fact that DFS is not in the home health care business is irrelevant because nothing would prevent DFS from selling the assets at their discrete value. Surely the market can better assess the value of these assets than can the parties' expert economists. However, we will not delay the case by a second remand to the district court for further factual findings. We thus assume for now that the assets are available in substantially the same form as they were when they were transferred. If the Indiana Supreme Court determines that conveyance of the assets to DFS is the preferred remedy, we may then remand to the district court to further address this question as necessary.

(B) Appointment of a receiver to take charge of the asset transferred or of the property of the transferee.

(C) *Any other relief the circumstances require.*

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

Ind. Code. § 32-18-2-17 (emphasis added). Although the section specifically discusses only remedies which are equitable in nature, the catchall provision (allowing a creditor to obtain "any other relief the circumstances require") would seemingly empower a court to provide monetary relief at its discretion. *See, e.g., Freeman v. First Union Nat'l*, 329 F.3d 1231, 1234 (11th Cir. 2003) (citing *Hansard Construction Corp. v. Rite Aid of Florida, Inc.*, 783 So.2d 308 (Fla. Dist. Ct. App. 2001) ("Despite the fact that the other remedies set forth in the Act are equitable in nature, we find this catchall provision sufficiently broad to encompass the monetary judgment sought by appellants.")); *Morris v. Askeland Enters., Inc.*, 17 P.3d 830, 833 (Col. Ct. App. 2000) ("[A] court acting in equity always retains the power to enter a monetary award to implement its decree . . . ."); *Profeta v. Lombardo*, 600 N.E.2d 360, 362 (Oh. Ct. App. 1991) (allowing money damages under the catchall provision of OUFTA); *see also* Bruce Markell, *The Indiana Uniform Fradulent Transfer Act Introduction*, 28 Ind. L. Rev. at 1223 (noting that "[t]he remedies specified in [Section 17] are not exclusive"); *but see Forum Ins. Co. v. Devere Ltd.*, 151 F. Supp. 2d 1145, 1148 (C.D. Cal. 2001) (applying Cal. Civ. Code. § 3439.07(a)) ("Terms such as 'liability' and 'damages' do not appear in the statute. . . . Thus, by its terms, UFTA allows only equitable remedies such as avoidance, attachment, an injunction, or appointment of a receiver."); *Mack*, 737 F.2d at 1361 (same under Bankruptcy Act of 1898).

The next section of the IUFTA discusses a "[t]ransferee's defenses, liability, and protections" and notes that:

> (b) Except as otherwise provided in this chapter, to the extent a transfer is voidable in an action by a creditor under section 17(a)(1) of this chapter, *the creditor may recover judgment for the value of the asset transferred*, as adjusted under subsection (c), *or the amount necessary to satisfy the creditor's claim*, whichever is less . . . .

> (c) If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

Ind. Code. § 32-18-2-18 (emphasis added). Similarly, we find no language in this section expressly limiting a court's ability to award monetary damages to the situation in which the assets are unavailable for reconveyance. The appellants argue that the phrase "[e]xcept as otherwise provided in this chapter" should be read as referring to section 17, and should thus be understood to mean that monetary damages are not available if equitable relief is available under section 17. We do not find this to be a plausible reading of the statute.

First, it is curious that, if the drafters intended this language in section 18 to mean that monetary damages are not available where equitable relief is available under section 17, they would not just have written "except as otherwise provided in *section 17*" or "to the extent sufficient equitable relief is unavailable." Second, it seems odd that the drafters would state "except as otherwise *provided*" rather than "except as otherwise *available*." The use of the word "provided" suggests that monetary relief could be awarded instead of equitable relief, so long as the court has not awarded equitable relief. Third, because section 17 allows for "any other relief the circumstances require," allowing monetary

relief under section 18 "except as otherwise provided in [section 17]" would seemingly provide no real limitation on the court, and allowing monetary relief "except as otherwise *available* in [section 17]" would seemingly mean that no relief could ever be awarded under section 18. Finally, under the appellants' interpretation of the "except as otherwise provided" clause, if a court ordered that assets be reconveyed under section 17, but the assets had seriously depreciated in value since the time of the fraudulent transfer, the statute would seemingly not allow for an award of any additional monetary damages to make up the difference. This would contradict the holding of even those cases upon which the appellants rely. *See, e.g., Robinson v. Coughlin*, 830 A.2d 1114 (Conn. 2003); *In re McLaughlin*, 183 B.R. 171, 177 (Bankr. W.D. Wis. 1995).

Nonetheless, we are aware of no reported cases in which monetary damages were awarded under the IUFTA, and courts such as *Robinson* have held under their state version of the UFTA that monetary damage awards are only appropriate where reconveyance of the fraudulently transferred property is impossible or where the subject property has depreciated in value. Policy considerations would support such a rule, as it would avoid speculation as to the value of conveyed assets. *See, e.g., In re Vedaa*, 49 B.R. 409, 411 (Bankr. N.D. 1985) (noting in the context of the Bankruptcy Code that "it is clear that courts favor a return of the property itself if at all possible so as to avoid speculation over its value"). This case exemplifies the problem with such speculation, in that it has been argued that these assets range in value from $20,000 to $640,000 (the jury determined that they were worth $470,000). App. at 222, 295, 301. Therefore, we hereby certify to the Indiana Supreme Court the question whether an award of monetary damages under the IUFTA is only available where reconveyance of the fraudulently transferred property is impossible or where the subject property has depreciated in value, or whether the nature of the award is at the court's discretion.

**D.  Punitive damages under the IUFTA**

Finally, the appellants appeal the district court's award of punitive damages, arguing that such damages are not available under the IUFTA. Yet a straightforward reading of the IUFTA's catchall provision would seemingly allow for punitive damages. *See* Ind. Code. § 32-18-2-17(c) (allowing a court to award "any other relief the circumstances require"). Moreover, as noted earlier, the IUFTA incorporates principles of state common law. Ind. Code § 32-18-2-20. Under Indiana law, tortious conduct involving "malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact of law, honest error or judgment, overzealousness, mere negligence, or other human failing" may be punished by an award of punitive damages. *Erie Ins. Co. v. Hickman*, 605 N.E.2d 161, 162 (Ind. 1992). In this case, the jury found that Leestma personally engaged in such conduct, seemingly making punitive damages appropriate. App. at 302, 312.

No Indiana court, however, has addressed the question whether punitive damages can be awarded under the IUFTA, and other states are split on the question. *Compare Macris & Assocs., Inc. v. Neways, Inc.*, 60 P.3d 1176, 1181 (Utah Ct. App. 2002) (allowing punitive damages under Utah's UFTA); *Volk Constr. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 900 (Mo. Ct. App. 2001) (same under Missouri's UFTA); *Henderson v. Henderson*, No. CV-00-53, 2001 WL 1719192, at *2 (Me. Super. 2001) (same under Maine's Uniform Fraudulent Conveyance Act); *Locafrance United States Corp. v. Interstate Distribution Servs., Inc.*, 451 N.E.2d 1222, 1225 (Ohio 1983) (same under Ohio's Uniform Fraudulent Conveyance Act), *with Morris*, 17 P.3d at 833 (finding punitive damages are not available under Colorado's UFTA), *and Northern Tankers Ltd. v. Backstrom*, 968 F. Supp. 66, 67 (D. Conn. 1997) (same under Connecticut's UFTA).

Leestma argues that the Indiana Supreme Court would conclude that punitive damages are not recoverable under the IUFTA because Indiana construes statutory remedies narrowly and only allows for punitive damages when the legislature expressly includes them in the statute. Leestma Br. at 43-45. However, in none of the cases cited by Leestma did the statute in question contain anything like the catchall provision which is present in the IUFTA. *See Forte v. Connerwood Healthcare, Inc.*, 745 N.E.2d 796, 800 (Ind. 2001) (reversing an award of punitive damages under the Child Wrongful Death Statute which "contained an exclusive list of damages recoverable by a child's parent or guardian"); *Fleming v. Int'l Pizza Supply Corp.*, 676 N.E.2d 1051, 1058 (Ind. 1997) (declining to find individual liability or punitive damages under Indiana's Business Corporation Laws, where the statute allowed only for appraisal); *Watters v. Dinn*, 633 N.E.2d 280, 286 (Ind. Ct. App.1994) (declining to create a civil remedy where the Act under which the plaintiff was suing did not allow for a civil action); *DeMayo v. State ex rel. Dept. of Natural Resources*, 394 N.E.2d 258, 261 (Ind. Ct. App. 1979) (reversing an award of monetary damages where the statute only "authorized and empowered [the Indiana Department of Conservation] to bring in any court of proper jurisdiction, actions by way of injunction, either prohibitive or mandatory, or both"). We do not believe that these cases provide much insight into how Indiana would decide this question and we therefore certify to the Indiana Supreme Court the question whether punitive damages are available under the IUFTA.

## III.  CONCLUSION

In conclusion, we certify the following three questions to the Indiana Supreme Court:

(1) Can an officer or director of a "first transferee" under the IUFTA who is found to have personally

participated in the fraud be held personally liable under Indiana law on that basis alone?

(2) Is an award of monetary damages under the IUFTA available only where reconveyance of the fraudulently transferred property is impossible or where the subject property has depreciated in value?

(3) Are punitive damages available under the IUFTA?

We invite, of course, the Justices of the Indiana Supreme Court to reformulate our questions if they feel that course is appropriate. We do not intend anything in this certification, including our statement of the questions, to limit the scope of their inquiry. Further proceedings in this court are stayed while the Indiana Supreme Court considers this certification.

A true Copy:

      Teste:

                   _____
                   *Clerk of the United States Court of Appeals for the Seventh Circuit*