**FIRST DIVISION**
**MCMILLIAN, J.**
**MERCIER AND SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 20, 2017**

# In the Court of Appeals of Georgia

A17A1160. INTERFINANCIAL MIDTOWN, INC. et al. v. SE-046 CHOATE CONSTRUCTION COMPANY.

SELF, Judge.

Following a five-day jury trial, Interfinancial Midtown, Inc. ("I-Midtown"), Piedmont Fountains, LLC ("Piedmont Fountains"), Scott Leventhal, and Interfinancial Properties, Inc. ("I-Properties"), appeal a judgment in favor of Choate Construction Company ("Choate Construction"). Appellants assert the trial court erred by (1) allowing Choate to recover general and punitive damages under Georgia's Uniform Fraudulent Transfers Act ("UFTA"), OCGA § 18-2-70 et seq.; (2) precluding their defense based upon reconveyance of assets; (3) allowing Choate to recover attorney fees and special master costs and expenses; (4) granting Choate's motion in limine to exclude expert evidence relevant to appellants' intent; and (5)

denying their motion for a directed verdict and charging the jury on post-judgment interest. For the reasons explained below, we affirm.

The evidence submitted at trial shows that in October 1999, Leventhal created I-Midtown. As its CEO, president, and a co-owner, he managed the daily business affairs of the company. In 2001, I-Midtown purchased property known as 700 Piedmont to develop 11 town homes through a $920,000 acquisition and pre-development loan with Quantum National Bank ("Quantum").[1] I-Midtown then hired Choate to perform construction work on the property.[2] I-Midtown's co-owner, Kurt Kaiser, experienced financial difficulties due to the "dotcom" bubble collapse and became insolvent in the middle of 2001.

Some time after September 11, 2001, a serious recession ensued and construction halted on the project. I-Midtown then began having issues paying its interest on the loan and property taxes. As a result, I-Midtown entered into a series of loan modification agreements with Quantum that extended the due date from 2001 through mid-2004.

---

[1] Leventhal personally guaranteed I-Midtown's loan with Quantum.

[2] Leventhal did not personally guarantee I-Midown's obligation to pay Choate.

2

In November 2001, Choate contended that I-Midtown owed it approximately $403,000 and demanded payment. In November 2002, Choate filed suit against I-Midtown for this amount ("*Choate I*"). Between 2002 and 2004, Leventhal attempted to sell the property to several different buyers with no success. He also asked Choate if it would like to become a partner in the project or assist with financing that would allow the project to move forward, but his efforts "[f]ell on deaf ears." Finally, John Williams[3] agreed to invest in the project, provided the property was "sold to a new entity of which he was a member."

In May 2004, Leventhal incorporated Piedmont Fountains to purchase and develop the 700 Piedmont property. The organizer of Piedmont Fountains was a separate corporation created by Leventhal in 1999, I-Properties.[4] Piedmont Fountains had only two members: John Williams, with a 20 percent interest, and I-Properties, with an 80 percent interest. Piedmont Fountain's operating agreement provided that I-Properties would receive a fee of $16,600 each month for management services for a total sum around $100,000, which was in turn paid to a construction manager

---

[3] Williams is a well-known Atlanta real estate developer who formed and ran Post Properties from 1970 through 2012.

[4] Leventhal was the sole owner and president of I-Properties.

required by Williams. In separate indemnity agreements executed before the sale of the property, I-Midtown and I-Properties acknowledged that "the Property [is] subject to" the pending *Choate I* lawsuit and agreed to indemnify Williams for any loss or damages arising out of the Choate lawsuit. Leventhal explained that "he who holds the gold makes all the rules. Mr. Williams was setting forth various rules for him to be involved in the participation of the development of this project." Williams testified that he wanted the property transferred to a new entity against which no claims were pending, and that he wanted the purchase price to be high enough to protect against fraudulent transfer claims.

On July 29, 2004, Piedmont Fountains purchased 700 Piedmont from I-Midtown for $1.29 million. At the time of the sale, Leventhal was the sole person making decisions on behalf of I-Midtown, as well as Piedmont Fountains. No purchase and sale agreement existed between the two parties, and Leventhal agreed that he made the decision about the purchase price on behalf of both the buyer and the seller based upon "a number of factors." These factors included "appraised value, market value, pro formas, [and] willingness of investors." Leventhal denied that he could have set the purchase price $400,000 higher in order to pay Choate, because it would have meant that Williams would have lost money on his investment. In support

4

of this position, Leventhal asserted that after all of the town homes were sold, the total profit for the development was less than $100,000. A higher sales price sufficient to pay Choate would have "resulted in a loss" for Piedmont Fountains. At the time of the sale, Choate had not filed any liens on the property.

Piedmont Fountains financed the purchase and completed construction of the project through a $3.1 million loan from Regions Bank, along with equity contributed by I-Properties ($145,000) and Williams ($125,000). Leventhal informed both Williams and Regions Bank about Choate's pending lawsuit against I-Midtown. Both Leventhal and Williams personally guaranteed the Regions Bank note. According to Leventhal, Regions issued the loan based primarily upon Williams' financial strength; "[t]here was no loan whatsoever to be obtained from Regions Bank without Mr. Williams being a co-guarantor on this loan."

At closing, I-Midtown used the $1.29 million purchase price to pay the balance of the loan to Quantum, recording costs, transfer taxes, various tax liens on the property, the attorney handling the payment of the liens, and ad valorem taxes. After these payments were made, I-Midtown received $300,660.13 at closing. Within nine months, Midtown used all but $1,105 of these funds to pay, among others, Leventhal $175,223, and I-Properties $13,282. With regard to the amount he received,

5

Leventhal explained that he used the majority of it to repay the $145,000 sum he had placed into I-Properties so it could make a capital contribution into Piedmont Fountains. Leventhal admitted that he authorized all of the disbursements made by I-Midtown after the sale of the property.

I-Midtown did not pay Choate with any proceeds from the sale. Leventhal testified that at the time of the sale in 2004, "[I-]Midtown did not believe that Choate had a valid right to any money whatsoever." Although money totaling $354,000 was placed back into I-Midtown between 2005 and 2010, it was not used to pay Choate. In Leventhal's view, "Choate and [I-]Midtown were entangled in a very disputed claim on the legitimacy of whether or not it was entitled to payment." The money received by Midtown was used "for its benefit to continue to operate and to continue to defend itself in the original Choate litigation as well as for a number of other unrelated matters to Choate." He explained, "I was paying those legal fees because I continued to believe that [I-]Midtown had an absolute defense to Choate's claim in the original Choate lawsuit and that it was really best served trying to defend against that claim and seeing whether or not [I-]Midtown could prevail." Leventhal admitted during cross-examination that through 2003, a plan existed to pay Choate the money it was owed.

Shortly after receiving proceeds from Regions Bank, construction began again on the project and the last unit was sold in 2006. In 2005, Choate filed the present case ("*Choate II*") alleging, in part, that the transfer of the 700 Piedmont property to Piedmont Fountains; the payment of $175,000 to Leventhal from proceeds of the sale; the payment of $13,282 to I-Properties from proceeds of the sale; and the transfer of $145,000 from Leventhal to I-Properties after the sale violated Georgia's UFTA. Choate also asserted a claim for bad faith under OCGA § 13-6-11 and sought compensatory and punitive damages as a result of the alleged fraudulent transfers. In June 2006, the trial court entered a consent order staying *Choate II* until 45 days after a final judgment in *Choate I*.

In 2010, Choate obtained a final judgment in the amount of $1,059.511.85, plus post-judgment interest, in *Choate I*. In 2016, *Choate II* was tried before a jury, resulting in a joint and several judgment against I-Midtown, I-Properties, Piedmont Fountains, and Leventhal in the amount of $1,731,858.15.[5] The jury also awarded

---

[5] In a consolidated pre-trial order entered before the trial, Choate asserted that the existence of a conspiracy between the four appellants "to hinder, delay or defraud Choate through any of the [t]ransfers" was an issue to be decided by the jury. The trial court charged the jury on conspiracy.

$40,300 in punitive damages against only Leventhal. At the time of the *Choate II* trial, it was undisputed that I-Midtown had not paid the judgment in *Choate I*.

1. *Recovery of General and Punitive Damages*. Appellants contend that the trial court erred by concluding that general and punitive damages may be recovered under the UFTA.[6] In their view,

> [t]he [UFTA] exists to provide a creditor with a means to recover that which the creditor could have collected or levied upon had its debtor (or judgment debtor) not engaged in fraudulent transfers. . . . [T]he Act's central purpose is restitution: to put creditor-plaintiffs back in the position they would have been in but for any fraudulent transfers . . . by returning the fraudulently-transferred assets into their debtors' names, attaching or seizing those assets, or awarding damages based on the lesser of the value of the assets or the creditor-plaintiffs' claims.

To support this argument, appellants point to the specific remedies provided by the Act, which they claim are the entire universe of what can be recovered.

In its brief, Choate points to a provision of the UFTA stating that creditors may also seek "[a]ny other relief the circumstances may require," OCGA § 18-2-77 (a) (3)

---

[6] While appellants assert that a "cascading effect" of the trial court's error in allowing general damages "can be seen in the fact that Choate now holds two judgments against Midtown for the same sum," Midtown does not assert any error in connection with this alleged double recovery.

(C), as well as OCGA § 51-12-2 (a), which provides that general damages may be recovered without proof of any amount for any tortious act. Choate contends that claims under the Act sound in the tort of fraud for which general damages can be recovered.

It is clear that both general and punitive damages could be recovered in fraudulent transfer cases before the General Assembly enacted the UFTA[7] in 2002. See *Kesler v. Veal*, 257 Ga. 677, 678 (362 SE2d 214) (1987) (general and punitive damages are permissible against debtor; award of such damages against "taking party" dependent upon proof of bad faith, actual fraud, or conspiracy on his part); *Cavin v. Brown*, 246 Ga. App. 40, 43 (2) (538 SE2d 802) (2000); *United States v. Tranakos*, 778 FSupp. 1220, 1225 (3) (B), n. 3 (N.D. Ga. 1991) ("creditor can obtain a personal money judgment against a transferee pursuant to OCGA § 18-2-22"). Before 2002, "Georgia's statute on fraudulent conveyances, OCGA § 18-2-22, was patterned after the English statute of 13 Elizabeth, Chapter 5 enacted by the British

---

[7] "Effective July 1, 2015, the Act has been renamed the 'Uniform Voidable Transaction Act.' Ga. L. 2015, p. 996 (Act 167), § 4A-1." *Bloom v. Camp*, 336 Ga. App. 891, 894 (1), n. 3 (785 SE2d 573) (2016). In this case, we must apply the version in effect at the time of the transfers. See *Gibson v. Gibson*, 301 Ga. 622, 628 (2) (801 SE2d 40) (2017). Unless otherwise noted, citations to the UFTA will be to the provisions in effect at the time of the transfers.

9

Parliament in 1570." (Citations and punctuation omitted.) *Kipperman v. Onex Corp.*, No. 1:05-cv-01242-JOF, 2010 U. S. Dist. LEXIS 18669 at *10 (N.D. Ga. 2010). Under OCGA § 18-2-22,[8] certain conveyances were defined as "fraudulent in law against creditors" and described as "per se fraudulent." *Chepstow Ltd. v. Hunt*, 381 F3d 1077, 1081 (III) (11th Cir. 2004). The General Assembly repealed OCGA § 18-2-22 when it enacted the UFTA in 2002. *Playnation Play Systems v. Hammer*, 277 Ga. App. 675, 676, n. 3 (627 SE2d 415) (2006).

Like its predecessor, OCGA § 18-2-22, the UFTA also deems certain transfers or obligations "fraudulent." OCGA § 18-2-74 (a). With regard to relief, the UFTA provides:

> (a) In an action for *relief against a transfer or obligation under this article*, *a creditor*, subject to the limitations in Code Section 18-2-78, *may* obtain:
> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by Chapter 3 of this title;
> (3) *Subject to applicable principles of equity and in accordance with applicable rules of civil procedure*:

---

[8] This Code section began by stating: "The following acts by debtors shall be fraudulent in law against creditors. . . ." It "was first codified in the Act of 1818." *RES-GA Hightower, LLC v. Golshani*, 334 Ga. App. 176, 180 (1) (a), n.5 (778 SE2d 805) (2015).

10

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
(B) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
(C) *Any other relief the circumstances may require.*
(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

(Emphasis supplied.) OCGA § 18-2-77. It also includes, in part, the following conditions for voidability of a fraudulent transfer:

(b) To the extent a transfer is avoidable in an action by a creditor under paragraph (1) of subsection (a) of Code Section 18-2-77, the following rules apply:

(1) Except as otherwise provided in this Code section, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this Code section, or the amount necessary to satisfy the creditor's claim, whichever is less. . . .

. . .

(c) If the judgment under subsection (b) of this Code section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

OCGA § 18-2-78 (b) (1) and (c).

11

The issue of first impression in this case is whether the specific relief listed in OCGA § 18-2-77 and OCGA § 18-2-78 precludes a creditor from obtaining additional relief in the form of general and punitive damages.

In considering this question,

> we apply the fundamental rules of statutory construction that require us to construe the statute according to its terms and to give words their plain and ordinary meaning. Thus, a statute should be read according to its natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending its operation.

(Citations and punctuation omitted.) *Kennestone Hosp. v. Cartersville Med. Center*, 341 Ga. App. 28, 29 (1) (798 SE2d 381) (2017). We must also "endeavor to give each part of the statute meaning and avoid constructions that make some language mere surplusage or meaningless." (Citation and punctuation omitted.) *Schick v. Bd. of Regents &c.* 334 Ga. App. 425, 432 (1) (779 SE2d 452) (2015). "[S]tatutes 'in pari materia', i.e., statutes relating to the same subject matter, must be construed together." (Citation and punctuation omitted.) Id. Other applicable principles include: "the legislature is presumed to know the condition of the law and to enact statutes with reference to it"; "the provisions of the statute enacted latest in time carry greater

weight"; and "a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent." (Citations and punctuation omitted.) *Williams v. State*, 299 Ga. 632, 634 (791 SE2d 55) (2016).

Before applying these principles, we must examine the condition of the law before the General Assembly adopted the UFTA. In *Kesler v. Veal*, 182 Ga. App. 444 (356 SE2d 254) (1987) (*Kesler I*), rev. in part, *Kesler v. Veal*, 257 Ga. 677 (362 SE2d 214) (1987) (*Kesler II*), this Court conducted a lengthy statutory analysis of the General Assembly's decision to define certain acts by debtors as "fraudulent in law against creditors and others" in former OCGA § 18-2-22. We concluded that its decision to so define such conduct as fraudulent created a tort and "we are hard put to say it constitutes no injury or that there is no cause of action for it and no redress *for the injury itself*." (Emphasis in original.) 182 Ga. App. at 447 (3). Accordingly, we concluded that the creditor could obtain a money judgment for fraud damages, as well as punitive damages. Id. at 451 (3). In so holding, we explained:

> To say the only remedy of the creditor is in equity to set aside the conveyance would be to urge the debtor to convey his property away to hinder and defraud creditors, for if he should get caught at it, no matter how fraudulent his intent or how odious the injury, the worst that could happen would be the setting aside of the conveyance and, even if the asset is destroyed or moved out of reach, equity would aid the creditor

13

in damages only to the extent of the debt. We think this defect in equity jurisdiction *requires* a remedy at law for damages for the fraud itself (see Moore, Fraudulent Conveyance, supra); it is indispensable to effect the legislative aversion to such a conveyance, which is so strong it declared the acts to be "fraudulent in law."

(Emphasis in original.) Id.

The Supreme Court of Georgia granted a writ of certiorari "to decide if a conveyance which if found to be fraudulent in law under OCGA § 18-2-22 will support an award of damages." 257 Ga. at 677. With no analysis, the Supreme Court agreed the damages as to the debtor "are permissible." With regard to the taking party or transferee, the Supreme Court concluded that general and punitive damages could be recovered only with "proof of bad faith, actual fraud, or conspiracy on his part." Id. at 678.

With presumed knowledge of these decisions, the General Assembly once again deemed certain transfers or obligations "fraudulent as to a creditor" with its enactment of the UFTA. OCGA § 18-2-74 (a). And while it outlined some specific remedies for the first time in OCGA §§ 18-2-77 and 18-2-78 that a creditor "may

14

obtain," it did not repeal OCGA § 18-2-20 and § 18-2-21.[9] Under these provisions, "[t]he rights of creditors shall be favored by the courts; and *every remedy* and facility shall be afforded them to detect, defeat, and annul any effort to defraud them of their just rights[;]"[10] and "[c]reditors may attack as fraudulent a judgment, conveyance, or any other arrangement interfering with their rights, *either at law or in equity*."[11] Additionally, OCGA § 18-2-82 provides: "Unless displaced by the provisions of this article, the principles of law and equity, including the law merchant and the law relating to . . . fraud . . . supplement its provisions." With regard to fraud, a long-standing statute in Georgia provides that "[f]raud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." OCGA § 51-6-1.

The General Assembly did not provide an exclusive list of remedies that a creditor "may obtain" under the UFTA because it also included a catch-all provision allowing a creditor to obtain "[a]ny other relief the circumstances may require." OCGA § 18-2-77 (a) (3) (C). Cf. *Parker v. State*, 296 Ga. 586, 594 (3) (a) (769 SE2d

---

[9] These provisions are not a part of the Uniform Fraudulent Transfer Act, which was approved by the American Bar Association in 1985.

[10] (Emphasis supplied.) OCGA § 18-2-20.

[11] (Emphasis supplied.) OCGA § 18-2-21.

329) (2015) (noting absence of catch-all provision in corresponding federal rule of evidence indicated intent of Georgia legislature to create an exclusive list). A number of jurisdictions interpreting the catch-all provision in the UFTA have interpreted it broadly to include damages beyond the equitable relief listed. *Harder v. Foster*, No. 116, 2017 Kan App. LEXIS 58 at \*36 (2017) (allowing award of attorney fees because "such collateral damages seem to be what the legislature had in mind when allowing a creditor not only to set aside a fraudulent conveyance but to 'any other relief the circumstances may require'"); *Klein v. Weidner*, 729 F3d 280, 288-296 (III) (B) (3rd Cir. 2013) (concluding broad catch-all provision in Pennsylvania's UFTA, along with nature and purpose of the UFTA and past case law, authorizes award of punitive damages); *Nichols v. YJ USA Corp.*, No. 3:06-CV-02366-L, 2009 U. S. Dist. LEXIS 22450 at \*24-27 (6) (applying plain language of catch-all provision of Texas UFTA to allow punitive damages); *Blood v. Nofzinger*, 834 NE2d 358, 372-373 (Ohio App. 2005) (interpreting catch-all phrase to allow general and punitive damages, as well as attorney fees); *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes*, 384 F3d 338, 352-354 (II) (C) (7th Cir. 2004) (rejecting argument that UFTA limits a court's ability to award monetary damages to situation in which the assets are unavailable for reconveyance; "catchall provision . . . would seemingly

16

empower a court to provide monetary relief at its discretion"); *Volk Const. Co. v. Wilmescherr Drusch Roofing Co.*, 58 SW3d 897, 900 (I) (Mo. App. 2001) (concluding catch-all provision "expressly grants courts the authority to employ the full array of remedial measures" and does not evidence an intent to prohibit punitive damages); *Airflow Houston v. Theriot*, 849 SW2d 928, 933-934 (2) (c) (Tex. App. 1993) (holding "any other relief the circumstances may require" was "quite broad" and authorized money judgment in amount of note plus interest; rejecting argument that creditor's only remedy was "the return of, and levy upon, the specific assets transferred").

Relying upon *Monastra v. Konica Business Machines*, 43 Cal. App. 4th 1628, 1645 (4) (b) (1996), a California appellate decision, appellants assert that the catch-all provision should be construed as referring only "to any other, appropriate *equitable* relief," because it comes after the statement: "Subject to applicable principles of equity. . . ." (Emphasis in appellant's quotation.) Appellants cite the following language from *Monastra* to support their argument: "remedies under California's version of Section 18-2-77 'include appropriate *equitable* remedies, including an injunction against further disposition of the asset, appointment of a receiver, or any other relief the circumstances may require.' (emphasis added)." This statement is

17

inapposite to the issue before us in this case, however, because it was made in a division of the opinion holding that "[a] constructive trust plainly is a proper remedy under [the UFTA]." Id. The California Court of Appeals did not address whether general or punitive damages could be awarded or whether *only* equitable remedies were appropriate.

Moreover, other courts which have addressed this argument have rejected it. See, e. g., *Klein*, supra. In *Klein*, the Third Circuit explained that

> the statutory requirement that any relief be subject to, and in accordance with, "applicable" principles of equity and rules of civil procedure could simply mean that any relief granted must comply with the rules and procedures implicated by the specific kind of relief at issue. For example, a creditor seeking an injunction would be required to meet the otherwise generally applicable requirements for this form of equitable relief (e.g., not have "unclean hands"), and a creditor seeking punitive damages likewise must satisfy the prerequisites for such an award (e.g., demonstrate that the defendant engaged in outrageous conduct).

729 F3d at 291 (III) (B).

Additional support for the view that this language allows the recovery of general and punitive damages can be found in an article[12] written by a reporter for the

---

[12] The Supreme Court of Georgia also relies upon scholarly articles when construing a statute for the first time. See, e.g., *United States Bank Nat. Assoc. v.*

18

committee that drafted the Uniform Voidable Transactions Act ("UVTA"), the

successor to the UFTA approved by the National Conference of Commissioners on

Uniform State laws in 2014.[13]

> The UFTA does not provide explicitly for the award of attorney's fees or punitive damages in an action under the [A]ct. However, its basic remedial provision, after enumerating various remedies, states that a creditor may obtain "any other relief the circumstances may require." This invites courts to consider themselves empowered to award attorney's fees, punitive damages, or both. Courts in some states have accepted this invitation; courts in other states have declined it. . . .
>
> The Study Committee considered whether the 2014 amendments should include a uniform provision on award of attorney's fees, and in response to a later suggestion the Drafting Committee reconsidered that issue as to both attorney's fees and punitive damages. Both committees decided not to pursue such a change. Neither committee gave extended consideration to the substance of the issue, i.e., whether and in what circumstances award of attorney's fees or punitive damages is appropriate. Rather, the decision not to pursue the matter was based on the perception that it would be pointless to do so because there would be little chance that a provision on the matter would be enacted uniformly whatever it said. . . .
>
> Hence the Drafting Committee left it to the individual states to address the availability of attorney's fees and punitive damages more specifically than does the official text, if they choose to do so. In drafting uniform acts involving issues on which states are apt to take differing approaches, it is sometimes useful to present alternative

---

*Gordon*, 289 Ga. 12, 16 (4) (709 SE2d 258) (2011).

[13] Georgia adopted the UVTA effective July 1, 2015. See Ga. L. 2015, p. 996, §4A-1; *Brock v. RES-GA SCL, LLC*, 340 Ga. App. 194, 195, n. 4 (796 SE2d 914) (2017).

19

language for states to choose between. In this instance, alternative language would have done no more than remind states that they might (or might not) wish to change their current law.

(Punctuation and footnotes omitted.) Kenneth C. Kettering, *The Uniform Voidable Transactions Act; or, the 2014 Amendments to the Uniform Fraudulent Transfers Act*, 70 Bus. Law 777, 788-790 (2015).

The author also explained:

A creditor seeking attorney's fees or punitive damages also has a second string to his bow. The UFTA contains a provision, familiar from its use in the Uniform Commercial Code, which states that principles of law outside the [A]ct supplement its provisions, unless displaced by the provisions of the [A]ct. As a result, if law outside the [A]ct can be said to authorize award of attorney's fees or punitive damages in an action under the [A]ct, then a court should apply that other law (for it seems clear that nothing in the [A]ct would "displace" that other law). Attorney's fees and punitive damages have been granted on that basis in a number of states. Such awards often have been based simply on the court's conclusion that the common law of the state authorizes such an award; sometimes the conclusion is bolstered by a non-UFTA statute (such as a statute of general application authorizing such relief against bad actors that is interpreted to apply to a voidable transfer).

(Punctuation and footnotes omitted.) Id. at 789.

In Georgia, our General Assembly left OCGA § § 18-2-20 and 18-2-21 intact when it enacted the UFTA and repealed OCGA § 18-2-22. As one federal court has recognized:

20

> It is evident that the Georgia legislature intended UFTA and § 18-2-21 to co-exist. Primarily, the legislature did not repeal § 18-2-21. In addition, UFTA provides that, "[u]nless displaced by the provisions of this article, the principles of law and equity, including . . . the law relating to . . . fraud . . . supplement its provisions." OCGA § 18-2-80. This indicates that the Georgia legislature was cognizant of the role of OCGA § 18-2-21 in relation to the repeal of § 18-2-22 and the adoption of UFTA.

*In the Matter of: Galbreath*, 475 BR 749, 752 (1) (b) (S. D. Ga. 2003). It therefore concluded that "OCGA § 18-2-21 provides a viable cause of action at law for fraudulent conveyance" following the repeal of OCGA § 18-2-22. Id. at 752 (1) (a). This Court has also recognized that in the absence of "any clear indication in the language" of the UFTA, we will not find that it has displaced our former law. See *RES-GA Hightower, LLC v. Golshani*, 334 Ga. App. 176, 179-180 (1) (a) (778 SE2d 805) (2015).

Based upon all of the foregoing, including the appropriate rules of statutory construction, we hold that Georgia law allowing the recovery of general and punitive damages for fraudulent conveyances survived the enactment of Georgia's UFTA.[14]

---

[14] The General Assembly's decision to leave OCGA §§ 18-2-20 and 18-2-21 intact also distinguishes decisions from other jurisdictions reaching a contrary result.

21

2. *Reconveyance Defense*. Appellants contend that the trial court erred by denying their motion for a directed verdict based upon transfers of cash into I-Midtown after the alleged fraudulent transfers. In their view, this alleged "reconveyance" constituted an "absolute defense." In support of this claim, they cite no Georgia law, relying instead upon cases from other jurisdictions.

In *Cavin*, supra, this Court rejected an analogous argument. In that case, the debtor and transferee argued that since the debtor paid all amounts due "shortly before the trial on the fraudulent conveyance, no fraud can be shown." 246 Ga. App. at 42 (1) (a). We rejected this argument, reasoning,

> [d]efendants misapprehend the date for determining what debt is owed to the creditor for purpose of adjudicating an alleged fraudulent conveyance. It is not the date of trial, but the date of the conveyance. [The debtor]'s belated paying off of the past due debt some eight months later on the eve of trial was no reason for the court to discontinue the fraudulent conveyance trial.

Id. See also *Carden v. Carden*, 253 Ga. 546, 547 (2) (322 SE2d 226) (1984) ("fact that [debtor] paid the entire note to the creditor, without the necessity for suit, is of no value to him, as the critical inquiry is his *intent at the time of transfer*. OCGA § 18-2-22") (emphasis in original). While these decisions admittedly applied former OCGA § 18-2-22, appellants cite no provision of the UFTA creating an "absolute

22

defense" based upon reconveyance, and we decline to create such a defense. In our view, the subsequent transfer of funds back into I-Midtown did not warrant a directed verdict in appellants' favor in this case, particularly since Georgia allows the recovery of general and punitive damages in UFTA cases.

3. *Attorney Fees and Expenses*. Appellants contend that "[t]he trial court erred in denying [their] motions for directed verdict with respect to attorneys' fees and expenses sought by Choate pursuant to OCGA § 13-6-11, and fees of the Special Master also sought by Choate, and in entering its Final Judgment awarding such fees and expenses." (Emphasis omitted.)

(a) *Special Master Fees*. Appellants assert that they were entitled to a directed verdict on this portion of Choate's claim because (1) the trial court originally stated that Choate would be responsible for paying the fees in its order appointing the special master; and (2) the special master's fees cannot be recovered as a part of general damages. We find no merit in these assertions.

As Choate points out in its brief, fees of a special master or auditor appointed by the superior court in a case such as this should be considered a cost or expense of

litigation. See OCGA § 9-7-22 (c).[15] Based upon Choate's claim for expenses of litigation under OCGA § 13-6-11, the trial court did not err by denying appellants' motion for directed verdict in connection with these fees. The fact that the trial court had earlier determined that Choate would be responsible for the fees does not preclude the jury from awarding them as an expense of litigation. The trial court did not err by denying appellants' motion for a directed verdict on the special masters fees.

(b) *Attorney Fees*. Appellants contend that the jury's award of attorney fees must be reversed because Choate failed to submit evidence allowing the jury to award only those attorney fees attributable to claims on which the plaintiff prevailed. See *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996) (reversing award of attorney fees because plaintiffs "did not prove the amount of attorney fees attributable solely to the claim in which they prevailed"). In support of this argument, they assert that Choate "introduced its attorneys' complete billing records . . . without segregating out any of the work done per claims against the

---

[15] While the court's order, prepared by Choate, referred to the appointment of a special master, the substance of the court's order shows that it should be considered as the appointment of an auditor under OCGA §§ 9-7-1 and 9-7-2. See *In the Interest of B. T. H.*, 326 Ga. App. 531, 533 (1) (757 SE2d 167) (2014) ("an order is defined not by its nomenclature but by its substance").

24

various Appellants (one of which, [I-]Properties, was not originally sued) or between successful and unsuccessful claims (such as those that the trial court dismissed with prejudice in December 2014)." We find no merit in either of these arguments.

First, Choate's counsel testified that he removed billing amounts for matters on which Choate had not prevailed from the invoices submitted to the jury. While appellants point to two pages of an invoice dated January 31, 2012, to support their claim that Choate failed to cull out time for claims on which it did not prevail, they fail to explain the entry to which they are referring and which claims were dismissed that were included in the bill. Nor do they explain how this alleged conflicting evidence demands a directed verdict in their favor. "An award of fees and expenses must be affirmed if there is any evidence to support it." *MDC Blackshear v. Littell*, 273 Ga. 169, 174 (5) (537 SE2d 456) (2000). Based upon the "any evidence" standard of review, we are not persuaded by this argument.

Appellants claim that Choate cannot recover the entire amount of fees in this action from I-Properties because it was not an original defendant in this case.[16] This Court has recognized that attorney fees incurred before suit is brought can be

---

[16] The record shows that the trial court granted Choate's motion to add I-Properties as a defendant in November of 2011.

recovered under OCGA § 13-6-11 if they are substantially related to the ultimate prosecution of the successful claim. See *Magnus Homes v. DeRosa*, 248 Ga. App. 31, 34 (3) (545 SE2d 166) (2001). In this case, each of the defendants was found liable for bad faith, and the fees incurred before I-Properties was added to the complaint were substantially related to Choate's ultimate success at trial. Accordingly, we find no merit in this portion of appellants' claim.

4. *Motion in Limine to Exclude Expert Testimony*. Appellants assert that the trial court erred by granting Choate's motion in limine to exclude expert testimony by Professor Clark D. Cunningham. The record shows that appellants intended to present Professor Cunningham to opine that I-Midtown had a valid defense to *Choate I* in order to explain the later use of reconveyed money to pay attorneys to defend I-Midtown in *Choate I*. Counsel argued at trial that the expert testimony would bolster and support Leventhal's decision to provide funds to I-Midtown for the purpose of paying attorneys to defend it in *Choate I*. Following a lengthy discussion with counsel before the trial began, the trial court granted the motion in limine based upon its conclusion that the expert's testimony would be cumulative of Leventhal's testimony and relitigate the issues of *Choate I*.

Whether expert testimony ought to be admitted under OCGA § 24-7-702 is a question committed to the sound discretion of the trial court." We will not disturb the trial court's determination "absent a manifest abuse of discretion." OCGA § 24-7-702 governs the admissibility of expert testimony, and it requires that the trial court act as "gatekeeper to ensure the relevance and reliability of expert testimony."

(Citations and punctuation omitted.) *Cash v. LG Electronics*, No. A17A0878, 2017 Ga. App. LEXIS 412 (2017). Additionally, the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403.

We find no error in the trial court's ruling. The intent at issue in this case was the intent at the time of the fraudulent transfers, not Leventhal's intent when he transferred money back into I-Midtown to defend *Choate I*. See *Carden*, supra, 253 Ga. at 547 (2).

Although evidence of collateral matters may throw some remote light on the main issues of the cases, it is nevertheless necessary that trial judges be vested with some discretion as to the admissibility of this type of evidence. Otherwise the whole course and progress of the trial could

27

become converted to the determination of collateral issues rather than the main one.

(Citation and punctuation omitted.) *Roberts v. Gunter*, 251 Ga. 276, 281 (4) (304 SE2d 369) (1983). We cannot say that the trial court manifestly abused its discretion by excluding evidence of a cumulative nature that could have confused the jury about the primary issue under consideration and created a re-trial of *Choate I*.

5. *Post-Judgment Interest*. In a compound enumeration of error, appellants contend that the trial court erred by (a) denying its motion for a directed verdict with regard to post-judgment interest on the *Choate I* judgment, and (b) charging the jury that it could consider and award post-judgment interest based upon the evidence presented at trial.[17]

The record shows that at the close of Choate's case, appellants moved for a directed verdict on the issue of damages because Choate failed to present evidence

---

[17] Appellants do *not* assert in their enumeration of error that the trial court committed an evidentiary error by admitting such evidence. Accordingly, to the extent appellants make such an argument elsewhere in their brief, we cannot consider it. See *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999) (appellate courts are precluded from reviewing the propriety of a lower court's ruling if the ruling is not contained in the enumeration of errors). "An appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of the errors." Id. at 539, n. 6.

28

of the prime interest rate for post-judgment interest. See OCGA § 7-4-12. Based upon the trial court's previous decision to exclude from evidence a document showing the prime interest rate, the trial court granted Choate's motion to reopen the evidence to allow its vice president to testify about the prime interest rate. The vice president testified that he "went to the federal government website, and they have an area that you can look at prime rates over from 1940 to today" and determined that "the prime interest rate that was in effect in 2010" was "3.25." Appellants' counsel did not cross-examine the vice-president; instead, he renewed the motion for a directed verdict "on the interest." The only specific argument related to Choate's failure to present evidence of the interest rate for the years following 2010. Counsel did not assert that the testimony was insufficient to establish the interest rate for 2010. The trial court deferred its ruling until the end of evidence in the case. Our review of the trial transcript reveals no ruling on the renewed motion, and appellants have not provided a record citation to any such ruling in their briefs. Following the verdict, appellants made an oral motion for judgment notwithstanding the verdict on unspecified grounds, explaining that they planned to "wait for the transcript to be prepared and brief that within the time period allowed. . . . " Appellants do not cite to any subsequent brief specifying the grounds for the oral motion and our review of the

29

index to this voluminous record revealed no filings related to the oral motion, much less a ruling by the trial court.

(a) Appellants' claim of error with regard to the trial court's alleged denial of their motion for a directed verdict is waived.[18] "It is the duty of counsel to obtain a ruling on his motions or objections, and the failure to do so will ordinarily result in a waiver. As [appellants] never sought to obtain a ruling on [their] motion following the close of evidence, [they have] waived this issue on appeal." (Citation and punctuation omitted.) *Bell v. Owens*, 230 Ga. App. 826, 828 (3) (497 SE2d 591) (1998).

(b) Appellants do not present any argument or citations of authority with regard to the trial court's jury charge in their brief. Therefore, this portion of their enumeration of error is deemed abandoned. See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); *Befekadu v. Addis Intl. Money Transfer*, 339 Ga. App. 806, 810 (2) (795 SE2d 76) (2016).

(c) Our holding in this Division renders Choate's pending motion for judicial notice moot.

---

[18] Appellants do not seek a new trial on the issue of post-judgment interest.

30

For all of the foregoing reasons, we affirm the judgment in favor of Choate.

*Judgment affirmed. McMillian and Mercier, JJ., concur in the judgment only.*